**RAMSOUER v. MIDLAND VALLEY R. CO.**
No. 12459.

Circuit Court of Appeals, Eighth Circuit.
April 7, 1943.

Clarence C. Chilcott, of Kansas City, Mo. (Fadjo Cravens, of Fort Smith, Ark., on the brief), for appellant.

James D. Gibson, of Muskogee, Okl. (H. L. Smith of Tulsa, Okl., and R. A. Young, Jr., of Fort Smith, Ark., on the brief), for appellee.

Before GARDNER, SANBORN, and THOMAS, Circuit Judges.

GARDNER, Circuit Judge.

This is an appeal from a summary judgment dismissing appellant's action brought to recover damages for the death of her husband. We shall refer to the parties as they appeared in the trial court.

The complaint as amended alleged that at the time of receiving his fatal injuries, deceased was employed by the defendant as a switchman at Pawhuska, Oklahoma; that he was injured on a siding or switch track maintained by defendant adjacent to the dock and warehouse of the Osage Flour and Feed Company. As the basis for her cause of action plaintiff alleged as follows:

"* * * that on or about the tenth day of January, 1937, defendant attempted to set out a car of merchandise on said siding at said dock which was approximately 42 inches high and 42 inches from said track, and that in moving and setting out said car at said time and place said decedent, Edward E. Ramsouer, was an employee of the defendant and was assisting the defendant in so doing by standing between said dock and said track at a point approximate-

ly opposite the doors of the warehouse hereinafter referred to and observing the position of said car with reference to said dock and warehouse and passing signals to those moving said car in order to spot the same for unloading at a place where the doors of said car would be opposite the doors of said warehouse which were located directly across and attached to said dock, when and where by reason of the negligence and carelessness of the defendant, the nature of which is unknown to the plaintiff and unascertainable by her, said car of merchandise, while being so moved, was caused to leave the rails of said switch track and move in the direction of decedent and said dock at a point approximately where decedent was standing and to run against, upon and over decedent as a direct result of which he was caught between said dock and said car and so rolled, injured, bruised, crushed and mangled in and about his head, face, body, hips and limbs as to immediately thereafter cause him conscious, great and excruciating pain, suffering and anguish of body and mind, and bring about his death, which occurred on or about the twentieth day of January, 1937."

After having answered the amended complaint, defendant interposed a motion for summary judgment. This motion contained averments to the effect that plaintiff had instituted an action in the District Court of Tulsa County, Oklahoma, on the identical cause of action, at which evidence was taken, and that at the conclusion of plaintiff's evidence defendant demurred to the evidence. The court then announced its intention to sustain the demurrer, whereupon plaintiff, with leave of court, dismissed her action without prejudice. The motion embodied a summary of the evidence submitted, and it was asserted that the evidence offered in the Oklahoma case established the fact that Edward E. Ramsouer was guilty of negligence and that plaintiff had not only failed to prove a cause of action or right of recovery but had affirmatively proven that she did not have any cause of action or right to recover against defendant. At the hearing of the motion for summary judgment, the trial court admitted in evidence the depositions and oral testimony taken and offered in the Oklahoma case and it also admitted evidence submitted by plaintiff. The court sustained defendant's motion on the ground that the facts showed no negligence and that the rule of res ipsa loquitur was not

applicable because the facts disproved negligence.

On this appeal plaintiff contends that an issue of fact as to defendant's negligence was presented, and hence, it was improper for the court to grant the motion for summary judgment.

Rule 56(b) of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c, provides that, "A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in his favor as to all or any part thereof." Subparagraph (c) of this rule provides that, "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that, except as to the amount of damages, there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law," then a summary judgment may be entered.

█ The record in this case is unusual in that it contains all the evidence introduced at the trial in the Oklahoma court. The question presented by such a motion is whether or not there is a genuine issue of fact. It does not contemplate that the court shall decide such issue of fact, but shall determine only whether one exists. A. B. C. Fireproof Warehouse Co. v. Atchison, T. & S. F. R. Co., 8 Cir., 122 F.2d 657; Miller v. Miller, 74 App.D.C. 216, 122 F.2d 209; Fox v. Johnson & Wimsatt, 75 U.S.App.D.C. 211, 127 F.2d 729. Defendant contends that the evidence conclusively proves that deceased was guilty of contributory negligence and that he assumed the risk. It will be necessary to examine the evidence to determine the soundness of this contention.

Deceased was a brakeman of many years experience. The train crew with which he was working on January 10, 1937, was made up of conductor McElwee, engineer Stubbs, fireman Bremicker, brakeman Kendall, and deceased. They were about to take a freight train from Pawhuska, Oklahoma, but the train had to be made up at Pawhuska and certain cars in the yards had to be switched before the train could leave. The car involved in the switching movements resulting in injury to Ramsouer had come to Pawhuska on train 99 and was to be switched to the spur track adjacent to the building of the Osage Flour and Feed Company, where it was to be "spotted." This

building next to the track was an open dock for unloading purposes, except for a space of 28 feet. At the place where the crew were intending to spot the car, the dock was 42 inches high and 42 inches distant from the track. There was a clearance of 16 inches between a freight car on the switch track and the dock. The track as it approached the warehouse curved, but it was straight as it crossed a street called Palmer Street, then curved and was again straight as it paralleled the warehouse. The switch track from the main line to the warehouse was about 200 feet in length. The car was moved by the crew out of train 99 to the main track, then to the team track and thence to the spur track leading to the warehouse. There were five cars in the group attached to the engine. Brakeman Kendall suggested that they should not attempt to put the car in on the switch track because that track was covered with ice and that they should take it back to the team track. Accordingly, they moved the group of cars to the team track, at which time deceased told Kendall that he would go into the office and see what they said about it. He there talked to Mr. Mason, General Agent for defendant at Pawhuska, and told him he didn't know whether the car would go in there or not. When he returned he told Kendall that they "had to take the car back to be spotted," and Kendall spoke to conductor McElwee, who also said they would have to put the car in at the warehouse. The cars were then backed in slowly on the switch track. Deceased had called upon McElwee to go with them, which he proceeded to do. Usually the conductor did not help with the switching movements at Pawhuska. The switch list is given to one of the brakemen acting as switchman—in this case, Ramsouer—and he handles the switching and does not go to the conductor unless there is something unusual, but here he called on the conductor. McElwee testified that he was in charge and said, "I am responsible and I look to Mr. Ramsouer to spot the car." McElwee stayed on the street crossing, while Ramsouer went down ahead of the car to the dock. The car was the leading car, farthest from the engine. Ramsouer was near the building referred to as the feed house. McElwee was near the switch and Kendall was on the other side, passing signals to the engineer. Kendall testified as follows:

"We backed the cars up slow, just barely moving on the track, watching it to see that it was on the rail, and came on back around the curve, and there was a little building there that obstructed the view of Mr. Ramsouer and of Mr. McElwee and Mr. McElwee followed the car on down and as it went I could see Mr. McElwee."

In response to a question as to who followed the car down, Kendall testified: "Mr. McElwee, down to the crossing stayed in sight of Mr. Ramsouer and myself. I couldn't see Mr. Ramsouer, but I was passing signals from Mr. McElwee, the conductor, to the engineer."

McElwee testified as follows: "Mr. Kendall was up on the head and passing signals to the engineer. It was the east car of five cars back from the engine. I was on the crossing west of the Osage Feed Store. I did not go down to the lower end of the track to see what the conditions were. Mr. Ramsouer followed the car on in between the house and the crossing and was in there giving signals. I was repeating them to Mr. Kendall and he was repeating them to the engineer. I was on the north side of the track. It was broad day light. The track is on a curve, and I could not look down the track."

McElwee was standing about 40 feet from the point where deceased received his injuries. Ramsouer went on down the track to the building and went in ahead of the car and walked between the platform and the car, giving his signals to come ahead. He stooped down, apparently watching the trucks of the car. The west wheels of the car went off the track and, according to the testimony, ran from 10 to 40 feet while off the track and then went back on. The east wheels then went off the track and ran while off the track about a car length. McElwee, observing that Ramsouer was in a dangerous place, gave the signal to stop. On his signal, the cars were stopped in two feet. Ramsouer was crushed between the car and the dock.

McElwee testified that he could have stopped the cars before Ramsouer got hurt. The cars were going down grade; the slack was all out of them so that when the engine stopped all the cars stopped. Deceased made a dying declaration to his wife in which he said that as the car approached the place where it was to be spotted, he gave McElwee a cautionary signal, but that McElwee did not appear to see the signal. Deceased looked up at him and saw that he was apparently looking down at the ground in front of him. Deceased then yelled at

McElwee to attract his attention to relay the signals on to Kendall, and while he was endeavoring to attract his attention the car jumped the track and crushed him. He said that if McElwee had seen his signal and relayed it to the engineer, the car would have been stopped "like that"—clapping his hands together. Deceased pulled himself up on the dock without help, and as McElwee bent over him, deceased said to him, "Why didn't you get my signal," to which McElwee replied, "Ram, I didn't see it."

In spotting cars at this place, deceased had theretofore given signals from the dock, but this time he gave them from the ground, and as he walked he watched the tracks and wheels of the car. He was in a stooping position lower than the floor of the car, and when he raised up the car caught him. If he had stayed in the stooping position he would probably not have been caught. The car was still six feet from the place where it was to be spotted when the accident happened. When Ramsouer raised up he put his hands up and the conductor stopped the car immediately. As the car was backing in, Mr. Mason walked backwards about six feet in front of the car, watching it. Deceased "hollered" twice. The first time nothing was done. The second time Mason and Mr. Basey, owner of the feed company, who was near, jumped up on the dock. The last car had been spotted at this dock on the 23rd of the previous month, and some twenty-five or thirty cars were spotted there each year. There was evidence that at the place where the car was spotted, the railroad company had placed cinders between the rails, even with the top of them, and Basey drove his trucks across the rails to and from the dock to load and unload. There had been freezing weather, alternating with milder temperatures, for about a week, with some precipitation in the nature of sleet and snow. The sleet and snow had not recently fallen. There was evidence showing that freezing will cause ballast against the rails to bulge upwards, and there was evidence that the ground and rails were covered with ice and snow which condition had not been caused by recent snowfall. One witness testified that there was ice and snow on the ground, that there was a little depression or sink where the rails were, and one could tell where the rails were because ice and snow did not stay on them as it did on the ground. A witness testified:

"Q. Now, this ice there was frozen solid so that the ice was just smooth and level along there, so the car wheels rode on top of it and did not cut down through it? A. Oh, they cut down through it, mashed it down.

"Q. But they did not get down through the ice all the way to the ground? A. No.

"Q. You made a statement about this just after it happened, Mr. Thomas, didn't you, and signed a statement about it? Is that your signature? A. Yes.

"Q. Now, I am calling your attention to the last sentence in this statement: 'The ground was very near solid and it had sleeted until it was level with ice and the car wheels rode the top of the ice and did not cut down through it, and that is what started the wheels to leave the track.' Now, that is right, isn't it, Mr. Thomas? A. Yes, but they didn't cut down through it, but riding on top, after those wheels were off the track, they rode along on that sleet, by jove, as if they were on a solid rail; it was packed down though, but it didn't cut through it."

McElwee testified: " * * * the truck had to go over the ice, and that is what put the car off, it was above the rail, so it just dropped off, and then the car went right to that dock."

Another witness testified that the ice bogged up on the wheel, which caused it to leave the track. Simpson, a section man, who inspected the track for defendant the following morning, testified: "Well, the track was covered with ice and snow practically all the way back there, and this car clumb over the rail and run away from the platform, and then out this way back."

He testified that the ice and snow rode the car off the track and that ice and snow would be likely to ride it off the track and a competent, experienced trainman would know that sufficient ice and snow would cause the car to leave the track. He said: "I say it all depends on the lay of your track, and whether curved or a straight track. I have seen them go through deep snow and ice and go right on through and not get off the track."

Another witness testified that he could not see the rails at all.

We have not reviewed all the evidence bearing upon the particular features stressed by the respective parties, and there is more or less conflict in the testimony, but the issue to be tried on a motion for

summary judgment is whether or not there is a genuine issue as to any material fact, and not how that issue should be determined. In considering such a motion as in a motion for a directed verdict, the court should take that view of the evidence most favorable to the party against whom it is directed, giving to that party the benefit of all favorable inferences that may reasonably be drawn from the evidence. If, when so viewed, reasonable men might reach different conclusions, the motion should be denied and the case tried on its merits.

■ Viewing the evidence in the light most favorable to plaintiff, we think it presented a genuine issue of fact from which a jury might reasonably decide that Ramsouer's injuries resulted in whole or in part from the negligence of the defendant (1) in that it failed to maintain this switch track in a reasonably safe condition, or place it in such condition by removing the ice and snow at least from the curve therein prior to attempting the switching operation; (2) in filling up the space between the rails, up to the top of the rails, with cinders, near the warehouse where the derailment occurred; (3) in directing Ramsouer, after he had called the attention of his superiors to the dangerous condition of the track because of the accumulation of snow and ice thereon, over his protest, to attempt the switching operation; (4) in failing to stop the movement of said car after the wheels of the car had become derailed, it appearing that thereafter and while certain of the wheels of the car were off the track, it was moved a distance of approximately 80 feet, all in the presence and with the knowledge of the conductor, who could have stopped the movement; (5) in failing to hear, see or heed the cautionary or stop signals given by Ramsouer; (6) in the failure of Mason and McElwee to be attentive or respond to the cries of decedent, it appearing that prompt action on his first "holler" might have been sufficient to save deceased from injury.

■ The liability of the defendant is governed by the provisions of the Federal Employers' Liability Act, 45 U.S.C.A. § 51, and can only be maintained in the event that the injuries resulted in whole or in part from the negligence of defendant. McGivern v. Northern P. R. Co., 8 Cir., 132 F.2d 213; Northwestern Pac. R. Co. v. Bobo, 290 U.S. 499, 54 S.Ct. 263, 78 L.Ed. 462; Baltimore & O. R. Co. v. Berry, 286 U.S. 272, 52 S.Ct. 510, 76 L.Ed. 1098. We think

the foregoing present genuine issues of fact.

■ It is urged by defendant that plaintiff was not entitled to go to the jury because she alleged a cause of action based on the rule or doctrine of res ipsa loquitur, in that the evidence disclosed the cause of the injury. We think this is a misconception of the application of the doctrine of res ipsa loquitur. If the evidence had disclosed the cause of the injury and had also disclosed that it was not caused in whole or in part by the negligence of the defendant, then plaintiff's action would fail. The doctrine of res ipsa loquitur, however, is not a rule of pleading, not a substantive rule of law, but a rule of evidence. Whitmore v. Herrick, 205 Iowa 621, 218 N.W. 334; Heffter v. Northern States Power Co., 173 Minn. 215, 217 N.W. 102; Lynch v. Ninemire Packing Co., 63 Wash. 423, 115 P. 838, L.R.A.1917E, 178; Stewart v. Crystal Coca-Cola Bottling Co., 50 Ariz. 60, 68 P.2d 952; Michener v. Hutton, 203 Cal. 604, 265 P. 238, 59 A.L.R. 480; Wilson v. Colonial Air Transport, 278 Mass. 420, 180 N.E. 212, 83 A.L.R. 329. The mere fact of an injury to an employee while engaged in the discharge of his duties does not create a presumption of negligence on the part of the employer as a general rule, yet where the instrumentality which produced the injury is shown to have been under the control and management of defendant, and the occurrence is such as in the ordinary course of events does not happen if proper care is exercised, the fact of the injury itself, in the absence of explanation by the defendant, gives rise to an inference of negligence on the part of the defendant. Pitcairn v. Perry, 8 Cir., 122 F.2d 881; Missouri & N. A. R. Co. v. Vanzant, 100 Ark. 462, 140 S.W. 587. The doctrine is applicable where there is no evidence, circumstantial or otherwise, to show negligence apart from the happening of the accident or the infliction of the injury. But the rejection of the doctrine of res ipsa loquitur does not mean that negligence may not be established by circumstantial evidence, as well as by direct evidence. Gantt v. Columbia Coca-Cola Bottling Co., 193 S. C. 51, 7 S.E.2d 641, 127 A.L.R. 1185; Heffter v. Northern States Power Co., supra. While we think the doctrine can not properly be invoked in this case, the fact that plaintiff attempted to invoke it in her pleading will not preclude her right of recovery if the facts, circumstantial or otherwise,

tend to prove that decedent's death was caused in whole or in part by the negligence of defendant. The question was considered by the Supreme Court of Minnesota in Heffter v. Northern States Power Co., supra, where, in an opinion by Chief Justice Wilson, it is, among other things, said [173 Minn. 215, 217 N.W. 104]:

"In the absence of its necessity, the rule fails. Under such circumstances the case goes to the jury unhampered by the rule."

In Whitaker v. Coleman, 5 Cir., 115 F.2d 305, 307, the court, in considering the applicable procedure on motion for summary judgment, said: "Summary judgment procedure is not a catch penny contrivance to take unwary litigants into its toils and deprive them of a trial, it is a liberal measure, liberally designed for arriving at the truth. * * * It is quite clear that technical rulings have no place in this procedure and particularly that exclusionary rules will not be applied to strike, on grounds of formal defects in the proffer, evidence proffered on tendered issues."

Rule 84 of the Rules of Civil Procedure provides for an appendix of forms intended to indicate "the simplicity and brevity of statement which the rules contemplate." Form 9 sets out a general allegation of negligence as sufficient. Plaintiff's complaint contains such a general allegation of negligence.

 It is, however, urged by defendant that no recovery can be had because decedent assumed the risk, which though not now available as a defense, was a defense when decedent's injury was received. As has been observed, decedent, after he had pointed out the condition of the track, was directed by his superior to spot the car at the dock. While defendant argues that it was not the custom of the conductor to take part in the operation of spotting a car, yet it appears that Mason, the agent, and the conductor were in fact both present, and the conductor was in charge of the crew; at least the evidence was such that the jury might have so found. Where an employee is directed to continue work, his exposure by reason of so doing to the apparent risk can not as a matter of law be held an assumption of the hazards involved. National Refining Co. v. Wreyford, 189 Ark. 598, 74 S.W.2d 633; New York N. H. & H. R. Co. v. Vizvari, 2 Cir., 210 F. 118, L.R.A.1915C, 9; Texas & P. R. Co. v. Behymer, 189 U.S. 468, 23 S.Ct. 622, 47 L.Ed. 905; Great Northern R. Co. v. Wojtala, 9 Cir., 112 F.2d 609; Fillippon v. Albion Vein Slate Co., 250 U.S. 76, 39 S.Ct. 435, 63 L.Ed. 853.

 Questions of negligence, contributory negligence and assumption of risk are ordinarily questions of fact to be determined by the jury. The argument that plaintiff can not recover because of deceased's contributory negligence is wholly without merit. Contributory negligence, while it may diminish the amount of recovery, is not a defense to a cause of action bottomed on the Federal Employers' Liability Act, § 3, 45 U.S.C.A. § 53.

Some of the recited facts appear in an affidavit of deceased's wife, purporting to give the substance of his dying declaration. Section 5201, Pope's Digest of the Statutes of Arkansas, provides: "In all suits for the recovery of damages for fatal injury or death of any person, the dying declarations of the person for whose fatal injury or death such suit has been brought in respect to the facts or circumstances pertaining to such fatal injury or death of such person or the cause thereof may be proved and admitted in evidence in like manner as dying declarations are now allowed to be proved and admitted in evidence in homicide cases in this State."

It is the contention of defendant that Section 5156, Pope's Digest 1937, makes this evidence inadmissible. Apparently the trial court did not accept this view of the defendant and defendant has not appealed. But as a new trial must be granted the question may again rise, and hence, we give it consideration. The statute provides that in certain relationships the parties thereto shall be incompetent to testify for or against each other. The statute contains the following inhibition:

"Husband and wife, for or against each other, or concerning any communication made by one to the other during the marriage, whether called as a witness while that relation subsists or afterwards, but either shall be allowed to testify for the other in regard to any business transacted by the one for the other in the capacity of agent."

 This is a modification of the common law rule holding a husband and wife incompetent as witnesses for or against each other. The purpose of the statute was to remove grounds of incompetency, and not to increase them. Halback v. Hill, 49 App.D.C. 127, 261 F. 1007. We

are of the view that the statute is not applicable to a dying declaration made by one spouse to the other which is offered in an action brought by one for his own benefit. Plaintiff did not testify for or against her husband, but in her own behalf in an action which accrued to her on the death of her husband. McDonnell v. Swift & Co., 124 Kan. 327, 259 P. 695.

We conclude that the entry of summary judgment was not warranted and the judgment appealed from is therefore reversed and the cause remanded with directions to hear the same in due course on its merits.