**BRYANT et al.**

v.

**CHICAGO MILL & LUMBER CO. et al.**

Civ. A. No. 2466.

United States District Court
E. D. Arkansas, W. D.

March 31, 1954.

R. D. Smith, Marianna, Ark., James T. Gooch, Arkadelphia, Ark., L. A. Hardin, Little Rock, Ark., for plaintiffs.

Daggett & Daggett, Marianna, Ark., Cracraft & Cracraft, Helena, Ark., for defendants.

LEMLEY, District Judge.

This cause is before the Court upon the defendants' motion for summary judgment, which motion has been submitted upon the pleadings, documentary evidence, and written briefs.

The plaintiffs, citizens of Arkansas, have brought this action against the defendants, corporations domiciled in states other than Arkansas, to establish their title to something over 500 acres of wild, unimproved and unenclosed land between the levee and the Mississippi River in Chicot County, Arkansas; the defendants by answer and counterclaim deny that the plaintiffs are the owners of the area in controversy and assert title thereto in themselves.

In their amended and substituted complaint, hereinafter called simply "the complaint", the plaintiffs allege that they are the owners of the West Fractional half of the Southeast Quarter and all of the Southwest Quarter of Section 7, Township 14 South, Range 1 West, in Chicot County, together with accretions thereto [1]; it is further alleged that when the township and range just mentioned were originally surveyed, the portions of Section 7 above referred to were riparian to the right descending bank of the River; that as time went on the River pursuing its characteristic course of channel change migrated eastward building up accretions to the above described lands, which accretions, plaintiffs contend, belong to them by virtue of purchases by them of tax titles from the State of Arkansas and from Southeast Arkansas Levee District and the Cypress Creek Drainage District. Plaintiffs' alleged titles were acquired in 1952. The prayer is for an injunction against trespass and for a decree quieting title to said lands in the plaintiffs.

The area in controversy is described by metes and bounds in the complaint, and attached to that pleading as an exhibit is a blueprint map of the area, together with surrounding lands; on this map the area in controversy is depicted in accordance within the plaintiffs' theory of its nature and origin, and shows said area as an accretion to Section 7 on the right descending mainland bank of the River as said bank existed in

1. Since all of the sections of land to which we shall have occasion to refer are located in Township 14 South, Range 1 West, we shall hereinafter simply refer to section numbers without mentioning the township and range.

1824. This blueprint map does not show a stream of water traversing this area which clearly appears on Chart 38 (at times erroneously referred to as Chart 37) of the Mississippi River Commission, which was published in 1879–1880, and which has been brought into the record by the defendants; in the conveyances making up the defendants' chains of title this stream is referred to as either "Island Chute"[2] or "Boggy Bayou". While the metes and bounds description contained in the complaint, and the depiction of the area in controversy on the plaintiffs' map indicate that said area lies on both sides of this stream, we do not understand that the defendants claim any lands lying to the west of the stream.

The plaintiffs' map shows that, according to plaintiffs' theory, the area in controversy accreted almost entirely to the Fractional West Half of the Southeast Quarter of Section 7; while a minute portion of the area is shown to have accreted to the extreme southeast corner of the Southwest Quarter of said Section, it appears from plaintiffs' map that the area shown to have accreted to the tract just described is so small as to be insubstantial; and in their brief the plaintiffs have not discussed their asserted ownership of the Southwest Quarter as a basis of their claim to the area. Moreover, plaintiffs' tax deeds covering the southeastern portion of the Southwest Quarter are void on their faces for indefiniteness of description. Hence, we shall confine ourselves to the plaintiffs' claim of title to the Fractional West Half of the Southeast Quarter of Section 7, and to their further claim that the area in controversy was formed as an accretion to it.

In their pleadings the defendants assert title to the area lying to the east of the chute or bayou under various recorded conveyances and also by virtue of tax payments by them and by their predecessors in title for a long period of time under color of title. They likewise assail the validity of the plaintiffs' tax titles on a number of grounds. The defendants further contend that the area in controversy did not form as an accretion to any portion of Section 7 which was located on the right bank of the River in 1824; it is their theory that said area was formed as accretion to two islands in the River, designated as Island 80 and Island 81, which were originally located in the channel of the River to the northeast of the West Fractional Half of the Southeast Quarter of Section 7 as shown by the original survey. Island 80 was in existence in 1824, and Island 81 was in existence in 1846, according to the plaintiffs' map. It appears from said map that the south end of Island 80 was located in the Northeast Quarter of Section 7, and would be properly described as the "Fractional Northeast Quarter of Section 7, East of Chute". The south end of Island 81 would be properly described simply as "Section 8" or as "Fractional Section 8". It appears that in 1846 Island 81 was the only part of Section 8 which was then in existence. There is no conflict of interest between the two defendants; Chicago Mill & Lumber Company claims to own that portion of the area which lies to the north of a red painted line running through the area, and United States Gypsum Company, hereinafter called Gypsum, claims to own that portion of the area lying to the south of said line.

■ Did we deem it necessary in order to pass upon the defendants' motion to solve the accretion problem in the case, that is to determine the nature and origin of the area in controversy, we would be required to overrule said motion since said problem involves a disputed question of fact. It is not the function of the Court in passing upon a motion for summary judgment to decide disputed factual questions, but simply to determine whether or not genuine issues

---

2. A "chute" as the term is used along the Mississippi River, is an inferior channel of the River running between an island and the mainland shore.

as to material facts exist. Dulansky v. Iowa-Illinois Gas & Electric Co., 8 Cir., 191 F.2d 881, 883; Ramsouer v. Midland Valley R. Co., 8 Cir., 135 F.2d 101. We are satisfied, however, from the record before us that the defendants do own the area in controversy regardless of whether it was formed as an accretion to the original mainland, as the plaintiffs contend, or whether it was, as the defendants argue, formed as an accretion to Islands 80 and 81.

Before undertaking to discuss the contentions of the parties and the facts in the case, we deem it advisable to refer to some well-settled principles of Arkansas law which are applicable to cases of this kind:

■ As is well known, the Mississippi, River, like the Arkansas, the Red, and other Rivers which might be mentioned, is not a stable stream as far as its channel is concerned; it is a characteristic of the River that it is continually changing its course by eroding its banks, and as the erosive process goes on on one side of the River, corresponding accretions or alluvial deposits are built up on the opposite bank. Under Arkansas law these accretions are private property and belong to the riparian owner against whose land they are formed even though they may extend so far from the original bank line as to occupy the geographical area originally occupied by the lands of the opposite riparian owner, which original lands had been destroyed by the River's erosion. As accretions automatically belong to the riparian owner, they pass automatically under a conveyance of the original land unless expressly excluded from the grant. Since accretions are private property they are also subject to taxation; ordinarily, however, payment of taxes on the original land amounts to payment on the accretion, and conversely a forfeiture and sale of the original land for non-payment of taxes carries the accretion with it.

■ These principles, however, are subject to the important qualification that there can be a severance of the accretion from the original land for tax and other purposes, and that after such a severance takes place, transactions involving the original lands do not affect the accretions.

■ While lands in Arkansas are generally and properly described in terms of the Government surveys, it is not absolutely necessary that they be so described. Generally, a description is sufficient if it serves to adequately identify the tract in question and to distinguish it from other tracts. When accretions are first formed, they are, of course, unsurveyed and unplatted; it has been held sufficient in describing such newly formed land for tax purposes to use descriptions representing extensions of the lines of the Government surveys over the body of the accretion, which was not included in the original surveys.

The foregoing principles have been frequently announced and applied by the Supreme Court of Arkansas, the United States Court of Appeals for the Eighth Circuit, and the United States District Courts sitting in this state. We do not stop now to give a list of the ruling Arkansas cases; excellent discussions of those decisions will be found in the opinions of the Court of Appeals in Chicago Mill & Lumber Co. v. Tully, 8 Cir., 130 F.2d 268; Anderson-Tully Co. v. Murphree, 8 Cir., 153 F.2d 874; and Anderson-Tully Co. v. Chicago Mill & Lumber Co., 8 Cir., 175 F.2d 735. See also, for a discussion of said principles, our opinions in the cases of Banks v. Chicago Mill & Lumber Co., D.C.Ark., 92 F. Supp. 232; and Kimble v. Willey, D.C. Ark., 98 F.Supp. 730.

Turning now to the facts in the case it may first be said that it is obvious that no part of the area in controversy was in existence in either 1824 or 1846; and it is equally obvious that subsequent to 1846 said area was formed as an accretion to either the West Fractional Half of the SE¼ of Section 7 as originally surveyed or to Islands 80 and 81. We, of course, do not choose between those two possibilities, but are

assuming without deciding, for the purpose of the motion under consideration, that the area formed as accretion to the mainland shore.

As early as 1900, a Mrs. Katie Connerly owned, or at least had color of title to, the Fractional West Half of the Southeast Quarter of Section 7 and to Islands 80 and 81. The defendants deraign her title to the two Islands back to the United States, but they do not set forth a straight record title with respect to the Fractional West Half of the Southeast Quarter of Section 7. Mrs. Connerly's title to the tract just described originated in a deed from C. H. Carlton and wife to Mrs. Eliza D. Pritchard, who in turn conveyed to Mrs. Connerly on December 12, 1898. The deed to Mrs. Connerly also conveyed Islands 80 and 81. The description contained in Mrs. Connerly's deed refers to the stream which, as above mentioned, traverses the area; said description is as follows:

"Six Hundred Eighty five and $^{34}/_{100}$ acres of land situated on Islands 80 and 81 in the Mississippi River and on the mainland near the foot of said Islands, and which is described as follows: All of fractional section 4; all fractional Section Five; East Fractional Part East of Island Chute of fractional Section Six; that part of the Northeast Quarter of fractional Section Seven lying East of said Island Chute; and fractional Section Eight; the Southeast Fractional Quarter of Section Seven; and East half of Southwest fractional quarter of Section Seven, together with all accretions and all privileges and appurtenances thereunto belonging."

The effect of this deed was to vest color of title in Mrs. Connerly to both of the possible sources of origin of the area in controversy.

On October 5, 1900, Mrs. Connerly conveyed by warranty deed to William McCoy the following described lands, which include the area in controversy:

" * * * All of the East part of the Northeast Quarter of Section Seven, lying East of Island Chute; also all Fractional Section Eight; also Fractional SE¼ of Section 7 lying East of Chute; also all of Fractional Section Six lying East of Island Chute; together with all accretions thereunto—any of said land added, all in Township Fourteen South, Range One West; it being the intention to grant, bargain, sell and convey unto the said William McCoy all of Island Eighty and Eighty-one and the accretions thereto lying South of the Township line between Township Thirteen South, Range One West and Fourteen South, Range One West." By a straight chain of mesne conveyances, wherein was employed the same or substantially the same description as that just quoted, said lands were conveyed to the defendant, Chicago Mill & Lumber Company, in 1936. The variations found in the descriptions contained in the various deeds in this chain of title are minor; in one of the deeds the "chute" is alternatively referred to as "Boggy Bayou", and the deed from W. R. Satterfield and wife to Mississippi Valley Timber Company contains the following recital: "The Stream designated above as 'Island Chute' is sometimes called or designated as Boggy Bayou, and when thus referred to means Island Chute." In 1941 the Chicago Mill & Lumber Co. quitclaimed to one J. C. Howe as trustee: "All that part of Section 17 and 18 in Township 14 South, Range 1 West and accretions thereto, if any, lying east of 'Boggy Bayou' and south of line delineated on said described lands identified by red painted marks and blazes along said line, heretofore established and now maintained by the grantor herein which said line runs generally in an easterly and westerly direction from said Boggy Bayou easterly to George Town Tohead Chute of the Mississippi River, being lands claimed by John C. Howe, trustee under deed executed him by George Leavenworth and Katherine Leavenworth, dated September 15, 1941

\* \* \*".3 Shortly thereafter, Howe, trustee, conveyed these lands to Gypsum.

As stated, Mrs. Connerly conveyed the lands lying "East of Island Chute" to the Chicago Mill & Lumber Company's predecessor, in 1900; in 1902 she conveyed to Charles S. Washington "The fractional W½ of S. E. ¼ and the fractional E½ of S. W. ¼ of Section 7 in Township 14 South, Range 1 West; containing by the United States Government Surveys 58 acres, together with all the privileges and appurtenances thereunto belonging or appertaining". The net result of the two conveyances by Mrs. Connerly which have been mentioned was that in 1900 she sold to the Chicago Mill & Lumber Company's predecessor in title her land lying to the east of the chute or bayou, and that in 1902 she sold to Charles S. Washington the portion of her property lying west of the stream.

Defendants have brought into the record a tax history prepared by Mr. J. B. Gillison, an experienced abstracter in Lake Village, covering the following described lands: Pt. NE¼ E of IC, Sec. 7, 90.50 acres; W Frl. ½ SE¼ of Sec. 7, 48 acres; E of Chute Frl. NE¼ of Sec. 7, 30 acres; All Frl. SE¼ E of Chute of Sec. 7, 90.50 acres; All Frl. Sec. 8, 527 acres. This tax history covers the years from 1912 to 1951, both inclusive, and shows that the Chicago

Mill & Lumber Co. and its predecessors in title have paid taxes on the lands, except the West Fractional Half of the SE¼ of Section 7, containing 48 acres, each and every year except 1918. In 1912, taxes on the West Fractional Half of the SE¼ of Section 7 were paid by J. E. & C. A. Lacy, and the same two men paid taxes under said description up through 1923; 1924 taxes on said description were paid by Ada G. Atchinson and the Union & Planters Bank and Trust Co.; 1925 taxes were paid by Ada G. Atchinson; said lands were forfeited in 1927 for non-payment of 1926 taxes, but were redeemed in 1929 by S. G. Lockhart, Receiver. The 1928 taxes were paid by said Receiver, and in 1930 said lands were forfeited for non-payment of 1929 taxes and were not redeemed. In 1952 the plaintiffs obtained a deed from the State Land Commissioner covering said 48-acre tract.

With respect to Gypsum's independent title, referred to in a preceding footnote, the record reflects[4] that in 1928 Georgia Pembroke, widow and sole legatee and devisee of Ed Pembroke, deceased, conveyed to J. H. Leavenworth & Sons, Inc., one of Gypsum's predecessors, the "East fractional half of Section 18, \* \* \* lying east of Boggy Bayou (or Island Chute) and containing about 208 acres, also Fractional NW part of Section 17, \* \* \* containing about

---

3. The description used in this deed calls for some explanation. The area in controversy is embraced within the lines of Sections 7, 8, 17 and 18, as extended across said area, and, as will be presently pointed out, taxes have been extended for many years against said area under descriptions which refer to said sections. While, as stated, there is now no controversy between Gypsum and Chicago Mill & Lumber Co., it appears that at one time there probably was a controversy between the defendant last named and Gypsum's predecessors in title, the latter asserting a claim to a portion of the area by virtue of tax payments upon descriptions in Section 17 and Section 18. It is at least fairly inferable that a settlement of this controversy brought about the execution of the quitclaim deed

just mentioned in the text, supra. In the instant case Gypsum has not only adopted the answer and counterclaim of its co-defendant, but is also re-asserting its own alleged title under the tax payments just referred to. It does not appear, however, that Gypsum takes any position with respect to the accretion aspect of the case which differs from that of the Chicago Mill & Lumber Company.

4. Gypsum deraigns its independent title and sets out its tax history in a number of requests for admissions served upon the plaintiffs pursuant to Rule 36 of the Federal Rules of Civil Procedure, 28 U.S.C.A.; since the plaintiffs neither responded nor objected to said requests within the prescribed time, the facts set forth therein stand admitted.

15 acres; and also all accretions to said land". The record further reflects that on October 1, 1932, J. C. Gillison, who had obtained a tax deed covering the Fractional Northwest Quarter of Section 17, conveyed said lands to Mattie Leavenworth, who was also one of Gypsum's predecessors in title. The tax history of the above described lands shows that taxes for the years 1902 through 1924, both inclusive, on the Fractional Northwest Quarter of Section 17 were paid by Ed Pembroke, above referred to. And said history further shows that taxes on the Fractional East Half of Section 18 for the years 1902 through 1925 were likewise paid by him. Between 1926 and 1944 taxes were not regularly paid, and the record discloses a number of forfeitures followed by redemptions. In 1944 Gypsum redeemed said lands from a 1942 forfeiture, and it paid the taxes thereon for 1943, 1944 and 1945 under the descriptions above set forth. Beginning with the year 1946, it appears that the lands claimed by Gypsum were described on the tax books as being all of Section 17 and all of Section 18, East of the levee, and that Gypsum paid the 1946 taxes and also paid taxes for each succeeding year down to and including taxes for 1952[5].

The record further reflects that sometime prior to December of 1902 the County Court of Chicot County directed the County Surveyor, T. S. Horner, to prepare a plat of the unsurveyed lands lying east of the levee in Chicot County to the end that said lands might be placed upon the tax books. The County Court record shows that on December 8, 1902, the Court ordered that: "all lands put on the tax books for the year 1902 as per plat made by T. S. Horner, not now upon said tax rolls and outside of the levee, be assessed at One Dollar per acre. And the Clerk of this Court is hereby ordered and directed to extend said taxes on said lands at that rate for the year 1902." Attached to the defendants' motion is a copy of the deposition given by Mr. Horner, who is now dead, in the so-called Georgetown Towhead case, Williamson v. Chicago Mill and Lumber Company, D.C.Ark., 51 F.2d 551; Mr. Horner deposed that about 1901 the County Court ordered him to make a survey of the unplatted accretions along the river front in Chicot County for the purpose of getting said accretions on the tax books; he further deposed that he made such a survey and filed a plat thereof, and that said plat remained in the courthouse for a number of years, but that it could not be located at the time he was giving his testimony. He further deposed that in making his survey he extended the lines of the original survey across the unplatted area. As pointed out above, taxes have been extended against the area in controversy under descriptions referring to the original survey lines as extended, and taxes have been paid thereon by the defendants and their predecessors for many years. We are convinced that the effect of Mrs. Connerly's two conveyances above mentioned and of the actions of the taxing officials of Chicot County in having the unplatted accretions surveyed and in extending taxes against them after the survey, was to sever the area in controversy from the original West Fractional Half of the Southeast Quarter of Section 7, if in fact said area was an accretion to the original land just described[6]. As pointed out, Mrs. Connerly in 1900 was the apparent owner of the land on both sides of this stream of water, and in that year she sold the land lying east of the stream to the Chicago Mill and Lumber Company's

---

5. 1952 taxes were not paid until 1953, which was subsequent to the filing of this suit.
6. In this connection we might say parenthetically that the fact that the West Fractional Half of the Southeast Quarter of Section 7 was separated from the rest of the area by a stream which was contemporaneously referred to as a chute tends, to a certain extent at least, to support the theory of the defendants that the area in controversy is an accretion to Islands 80 and 81, and to militate against the theory of the plaintiffs.

predecessor in title; two years later she sold the land lying west of the stream to Charles S. Washington. This she clearly had a right to do, and she had a right to describe said lands by reference to the natural boundary between the tracts, whether that boundary was a "chute" or a "bayou" or some other type of stream. That she may have erroneously referred to it as a "chute" is, to our mind, immaterial. Granting the validity of the plaintiffs' theory that the lands east of this stream were accretions to the mainland shore, we think that Mrs. Connerly, who owned both, sold the accretions east of the stream to one party, and the mainland shore and the accretions west of the stream to another [7]. Hence, subsequent transactions affecting lands to the west of the stream would have no effect upon the accretions east of the stream. We have already abstracted the tax transactions affecting these lands since 1912, as far as Sections 7 and 8 are concerned, and since 1902 as far as Sections 17 and 18 are concerned, and it is obvious that from those years on down to the present time the West Fractional Half of the Southeast Quarter of Section 7 lying to the west of Boggy Bayou or Island Chute, containing 48 acres, has been treated for tax purposes by the taxing authorities of Chicot County as an entirely separate and distinct tract of land from the area lying to the east of the stream. Taxes were assessed and extended against it as a separate tract, and such taxes were paid for many years as above noted; in 1930 it was sold as a separate tract of land for non-payment of 1929 taxes; it was separately certified to the State, and was sold by the State to the plaintiffs as a separate tract containing 48 acres, and the plaintiffs paid therefor the sum of $144,

which represented the statutory price of $3 per acre.

Since we are satisfied that the transactions above discussed had the effect of severing the accretions east of the stream from the mainland shore and the accretions west of the stream, it follows that the forfeiture of the West Fractional Half of the Southeast Quarter of Section 7 did not carry with it any land to the east of the stream and that when the plaintiffs obtained their tax deed they simply acquired the State's title to the original mainland shore together with such accretions as lay to the west of the stream; they acquired no title to any part of the area in controversy.

The question of the effect of a severance of accretions from the mainland upon the rights to the accretions of one who had purchased the tax forfeited mainland from the State, was before the Supreme Court of Arkansas in the case of Sanders v. Plant, 211 Ark. 913, 204 S.W.2d 323; and in that case it was held that where there had been a valid severance, a forfeiture of the mainland did not carry with it the accretion, and that a deed to the former did not convey the latter. The Court said:

"The chancellor held that in as much as the intervenor's grantor had purchased all these lands from the state and had received the deed of the State Land Commissioner therefor, and, in as much also as the former opinion upheld the sale of the Northeast Quarter, section 20, containing 58.87 acres, and the sale of the Northwest Quarter of that section, containing 98.30 acres, the sale thereof carried the title to the 60 acres of accretions to these two fractional quarter sections. Upon that finding the court awarded

7. That there are some accretions to the West Fractional Half of the Southeast Quarter of Section 7, as originally surveyed, lying west of the stream, seems clear from the fact that said tract of land, as originally surveyed, did not contain 48 acres of land. The tax records for 1901 show it as containing 11 acres, and this is about the acreage shown on plaintiffs' map. Ever since 1912, at least, this tract has been carried on the tax books as containing 48 acres. As we have said, defendants claim nothing lying west of the stream.

the writ of assistance as prayed for and from that decree is this appeal.

"For the affirmance of this decree appellee cites and relies upon the case of Towell v. Etter, 69 Ark. 34, 59 S.W. 1096, 63 S.W. 53, and later cases which have approved and followed that case. In this Towell case it was held, to quote a headnote, that 'A purchase at commissioner's sale for delinquent levee taxes of a tract of land described as the southwest quarter of a certain section, containing 151 acres, will carry title to 35 acres of land which had previously been added to such land by accretion.' The sale in that case was for delinquent levee taxes but the same rule was applied in the case of Crill v. Hudson, 71 Ark. 390, 74 S.W. 299 where the sale had been made for the non-payment of the general taxes.

"Apparently and prima facie it would appear that since appellee had acquired title to the Northeast Quarter and the Northwest Quarter of Section 20, he had also acquired title to the accretions to these two quarter sections. He correctly contends that, 'Unless there has been a severance of the riparian rights from the platted land, a conveyance of the platted lands carries all of the riparian rights and a separate conveyance of the riparian rights, among which are accretions, is wholly unnecessary.' The case of Mobbs v. Burrow, 112 Ark. 134, 165 S.W. 269, sustains this contention.

"However, the record before us on the former appeal shows there had been a severance of the riparian rights from the platted land.

"It appears that in May 1917, the county surveyor, at the request of Mrs. Sanders, who had acquired a life estate in the lands here in litigation under the will of her husband, made a survey of the accretions to these two quarter sections of Section 20 in order to have the land placed on the tax books. A map or plat of this survey was duly filed in the office of the county clerk on July 10, 1917, which was long prior to the assessment and sale of the land for the taxes for the non-payment of which they were sold, and from and after that date the 60 acres have been carried on the tax books and assessed separately and apart from the platted quarter section.

"This survey by the county surveyor was authorized by Section 13695, Pope's Digest, the purpose of that section being as was said in the recent case of Bracken v. Henson [211], Ark. [572], 201 S.W.2d 580, to secure a proper description of the land to be assessed so that it might be identified by reference to the plat of the survey which had become a public record. A prudent owner would prefer to pay his taxes under a description which identified his land so that there would be no question but that he had paid his taxes. This is what Mrs. Sanders did when she had the survey made and the plat thereof recorded as provided by Section 13697, Pope's Digest.

"Since this survey, the accretions have been carried on the tax books as a separate tract of land. It was separately advertised for sale for the delinquent taxes and was separately sold. It was separately certified to the state and was sold by the land commissioner to Plant under a separate description. This sale by the land commissioner, as stated in the former opinion, was made under the authority of Act 331 of the Acts of 1939 for the sum of $1 per acre, the minimum value required by said Act 331, and the recited consideration in the land commissioner's deed for the accretions was $60 there being 60 acres.

"We conclude, therefore, that there had been a separation of the accretions from the land to which

the accretions formed for the purpose of taxation. Now Plant, through whom appellee claims, did buy the accretions from the state and would have acquired title thereto under his purchase if the sale thereof for the taxes had been made under a valid description which could have been employed by a reference to the survey hereinbefore referred to in Bracken v. Henson, supra. But this 60 acre tract appears to have been described only as 'Accretions, Section 20' which was not definite in as much as these accretions had been formed to two separate quarter sections of that section."

It is earnestly contended by counsel for the plaintiffs that the descriptions of the lands lying east of the stream upon which the defendants rely are invalid, and that there was no valid severance. We cannot agree. According to the deposition of Mr. Horner in the Georgetown Towhead case above referred to, the County Court of Chicot County directed him about 1901 to make a survey of the unplatted accretions lying along the eastern border of the county to the end that such lands could be put upon the tax books, and he made such a survey and prepared a plat thereof, which described the accretions in terms of the original Government surveys as extended over the newly made lands. Thereafter, as stated, these lands were placed upon the tax books year after year in terms of those descriptions, and taxes have been paid upon them by the defendants and their predecessors as above noted. We also have before us the affidavit of Mr. J. B. Gillison, who has been previously mentioned, and that of Mr. Carneal Warfield, another abstracter at Lake Village. Mr. Gillison states, among other things, that ever since Mrs. Connerly conveyed to William McCoy in 1900, "all instruments affecting the title to said area have used the same description, which description is sufficient to notify the public as to what lands are conveyed, this area having been popularly known and assessed for taxes as 'All that part of the Northeast Quarter of Section Seven, East of Island Chute; All of Fractional Section Eight; Fractional Southeast Quarter of Section Seven, lying East of Chute, Township Fourteen South, Range One West', for more than fifty years." Mr. Warfield says in this connection: that since said deed from Mrs. Connerly to William McCoy, dated October 5, 1900, was executed the lands "lying immediately East of the West Half * * * of the Southeast Quarter * * * of Section Seven * * * have been popularly known and assessed for taxes and described in deeds of conveyance as 'All that part of the Northeast Quarter * * * of Section Seven * * *, East of Island Chute; all of Fractional Section Eight * * *; Fractional Southeast Quarter of Section Seven * * * lying East of Chute, * * *.' Since the execution of the above deed, said lands have been conveyed using substantially the same description, which is sufficient to notify the public as to what lands are conveyed."

In the light of these facts we feel that under the authority of Buckner v. Sugg, 79 Ark. 442, 96 S.W. 184, and Maney v. Dennison, 110 Ark. 571, 163 S.W. 783, the descriptions based upon the Horner survey and used by the taxing authorities of Chicot County were sufficiently valid to effect a severance of the accretions east of the stream from the mainland and accretions to the west of it.

In Buckner v. Sugg, supra [79 Ark. 442, 96 S.W. 185], accretions were formed as a result of the recession of the waters of Buford's Lake in Mississippi County, which was a meandered lake and was platted on the original surveys; after these lands were formed on the bottom of the original lake, they occupied what would have been the South Half of Section 12, Township 15 North, Range 12 East, had said lands been in existence at the time of the original survey. After the lands had formed, a survey was made of them by the County Surveyor, and on his plat he described them as the

South Half of Section 12 in the township and range above mentioned, and for more than 20 years prior to the filing of the suit said lands were commonly known and designated by that description. Levee taxes were assessed against them under said description, and the lands were forfeited for non-payment thereof. Thereafter, a controversy arose between the riparian own of the original mainland and the individual who purchased the accretions from the levee district, it being contended by the former that the land in controversy was not subject to taxation because it was unsurveyed land lying within Buford's Lake, and, further, that even if it were subject to taxation, the description used was insufficient. The Supreme Court rejected both contentions; it was said:

"Appellant contends that the sole question raised by the pleadings is that the land in controversy was not subject to taxation because it 'was unsurveyed land lying within Buford's Lake.' The complaint sets forth all the facts concerning the location, etc., of the land, and therefore presents for our consideration not only the question just stated, but also the further one now insisted upon by appellee, that the description of the land was so imperfect that the assessment and sale were void.

"The first-named question is easily disposed of in favor of the validity of the assessment and sale by reference merely to the fact that the land was private property, even though unsurveyed, and was, under the statutes of the state, subject to state and county taxes as well as levee taxes. The statute provides that 'all property whether real or personal, in this state,' except certain kinds which are declared to be exempt, shall be subject to taxation. Kirby's Dig. § 6873. The act creating the St. Francis levee district provides that all lands situated within the district shall be subject to levee taxes. Act Feb. 15, 1893, p. 29, § 7. Was the description sufficiently certain and definite to put the owner of the land on notice and authorize a valid assessment and sale? It is well settled not only by the decisions of this court, but by the adjudged cases in the courts of other states as far as we can discover, that, in order to make a valid assessment and sale of land for taxes, the land must be described with certainty upon the assessment rolls, and in all subsequent proceedings for the enforcement of payment of the tax. The chief reason for this requirement is that the owner may have information of the charge upon his property. It has sometimes been said that a description that would be sufficient in a conveyance between individuals would generally be sufficient in assessments for taxation. We do not, however, consider that a safe test. The description in tax proceedings must be such as will fully apprise the owner without recourse to the superior knowledge peculiar to him as owner, that the particular tract of his land is sought to be charged with a tax lien. It must be such as will notify the public what lands are to be offered for sale in case the tax be not paid. 1 Cooley on Taxation (3d Ed.) p. 742; Keely v. Sanders, 99 U.S. 441, 25 L.Ed. 327. The lands now within the meandered bounds of the lake have not been officially surveyed and platted, though the lines were run by the county surveyor by extension of the lines of the original public survey, and the tract in question has been popularly known by the description thus afforded. The controlling question in this case, therefore, is whether a description otherwise than by reference to plats of the original public survey or to other recorded plats properly identifying the tracts or lots of land, can be aided by extrinsic evidence of facts which serve to connect the description with the

particular tract or lot sought to be charged. The affirmative of this proposition seems to be established by the great weight of authority. Many of the courts have gone further, in support of this view, than we have felt willing to go, but an examination of the following cases will serve to illustrate the established doctrine. Cooper v. Holmes, 71 Md. 20, 17 A. 711; Textor v. Shipley, 86 Md. 424, 440, 38 A. 932; French v. Patterson, 61 Me. 203; Smith v. Messer, 17 N.H. [420], 426; Driggers v. Cassady, 71 Ala. 529; People v. Leet, 23 Cal. 161; Hopkins v. Young, 15 R.I. 48, 22 A. 926; State v. [Inhabitants of] Woodbridge [Tp.], 42 N.J.L. 401; Stewart v. Colter, 31 Minn. 385, 18 N.W. 98; Godfrey v. Valentine, 45 Minn. 502, 48 N.W. 325; Marsh v. Nelson, 101 Pa. 51.

\* \* \* \* \* \*

"Applying the established rule that a description in tax proceeding is sufficient which informs the owner and the public, with certainty, what particular tract of land is sought to be charged, how can it reasonably be said that this description is deficient or that it fails to give such information? The land is shown to have been popularly known and designated by this description. That description cannot possibly be applied to any other tract of land. Aside from the popular interpretation of this description it is not reasonably susceptible of any other interpretation than that it was meant to designate a tract of land bounded by extended lines of the public survey. \* \* \* We think that the description was, when aided by evidence, that the land has been surveyed, and is popularly known and designated thereby, sufficient to form the basis of a valid assessment and sale for levee taxes."

Essentially the same situation was presented in Maney v. Dennison, supra, and

the same result was reached. It was there said:

"It is insisted, in the first place, that the lands in controversy are not sufficiently described in the complaint to authorize a judgment for recovery, for the reason that they are described as a part of section 4, which it not on the government plats, and have never been officially surveyed. The proof shows, however, that the lands are popularly known as section 4 according to the extended lines of the government surveys, and we are of the opinion that this is a sufficient description upon which to base a judgment.

"For like reasons there could be a valid tax sale of the lands under that description, provided the same were subject to taxation. Buckner v. Sugg, 79 Ark. 442, 96 S.W. 184.

"If the land in controversy was formed to the main shore by accretion, and thus became the property of the private owners of the abutting lands, it was subject to taxation, though unsurveyed, and could be described in any appropriate manner sufficiently to give public notice as to what lands were taxed." 110 Ark. at pages 574–575, 163 S.W. at page 784.

■ Even if it be conceded that some of the descriptions appearing on the tax books are not sufficiently definite to uphold a tax sale of the lands covered by such descriptions, this would have no effect on the validity of the severance with which we are concerned. Such was the effect of the holding in Sanders v. Plant, supra, as is made clear by the fact that Justice McFaddin, in his dissenting opinion, took the position that since the accretions had been improperly described there had never been a valid severance. See 211 Ark. at pages 917–919, 204 S.W.2d at pages 325–326.

■ Plaintiffs assail the validity of the proceedings whereby the accretions in Chicot County were placed upon the tax books, and again we disagree with

their contentions. While it is true that there is not in the record before us any copy of the order of the County Court directing Mr. Horner to make his survey, and while it may be that no written order was ever entered, and while Mr. Horner's plat cannot now be located, yet it must be remembered that in the instant case we are dealing with events which transpired more than half a century ago and it is not surprising that certain old records cannot now be found. The lands were subject to taxation as private property, Buckner v. Sugg and Maney v. Dennison, both supra; and they have been taxed separately from the lands lying to the west of the stream for more than fifty years. Under such circumstances we believe that the presumption in favor of the regularity of official acts should be indulged so as to uphold the validity of these proceedings. Cf. Koonce v. Woods, 211 Ark. 440, 201 S.W.2d 748. Moreover, the plaintiffs are not the record owners of the West Fractional Half of the Southeast Quarter of Section 7; they are tax purchasers and stand in the shoes of the State, Koonce v. Woods, supra; as pointed out, the taxing authorities of Chicot County have extended and collected taxes on these lands under the descriptions to which we have referred for more than fifty years, and we do not think that the State or its privies can at this late date be heard to say that the proceedings whereby said lands were taxed were illegal.

At one point in plaintiffs' brief it is said: "Boggy Bayou can be found on the Survey of the Mississippi River, Chart 37, but descriptions in conveyances do not refer to this chart. These charts are maps of the Mississippi River, they do not purport to fix boundaries; they are not recorded in Chicot County, Arkansas, neither are the notes from which they are made. They are not sectionalized and they are not the basis for land descriptions. To what map, plat or survey does the description All Fractional, East of Chute, Section 7 or all of the Southeast Quarter of Section 7 refer? There is no official map,

plat or survey in Chicot County to which they could refer except the original United States Survey. It does not show the land." It is true that the charts of the Mississippi Commission do not purport to fix boundary lines, nor are they sectionalized, nor are they ordinarily the basis for land descriptions; neither are they filed for record in any of the counties of this State, nor are the field notes from which they are made. They are simply maps showing the course of the River at given times together with overbank topography back for some distance from the River. We have not considered the M. R. C. chart here in evidence for the purpose of determining boundary lines, or for the purpose of locating any particular section of land or portion thereof; as far as the instant motion is concerned, this map is relevant only to the extent that it shows that by 1879–1880 the accretion which had formed to original Fractional West Half of the Southeast Quarter of Section 7 or to Islands 80 and 81 was traversed from north to south by a substantial stream of water, which is obviously the stream referred to in the defendants' chain of title and in the descriptions contained on the tax books. Of course, these descriptions do not refer to the original Government surveys because neither the area in controversy or any such stream as the map shows was in existence in either 1824 or 1846. The defendants' conveyances and the tax books do describe the land in terms of the Government surveys as extended over the accretions, and they refer to a stream of water the physical existence of which is established by the M. R. C. chart. This chart is not only admissible in evidence, but it is also prima facie evidence of what it depicts; in Crow v. Johnston, 209 Ark. 1053, 1059–1060, 194 S.W.2d 193, 196, it was said: "As above noted, a number of maps and charts prepared by Government engineers and the Mississippi River Commission were placed in evidence and in the circumstances here, we attach considerable weight to them, their accuracy being unquestioned. In the recent case of Horne

v. Howe Lumber Company [209 Ark. 202], 190 S.W.2d 7, 10, we said: 'These surveys were prepared by the War Department and were admissible in testimony without other proof of their accuracy. It was held in the case of City of Los Angeles v. Duncan, 130 Cal.App. 11, 19 P.2d 289, 290, that: "Such maps are *prima facie* evidence of the facts shown thereon, but the weight and effect to be given thereto is a question of fact for the court." ' "

In their brief the plaintiffs also cite us to Anderson-Tully Co. v. Chicago Mill & Lumber Co., supra, 175 F.2d 735; but that decision is readily distinguishable from the instant case upon the same basis that the Court used in distinguishing between the situation before it and that which was before the Supreme Court of Arkansas in Buckner v. Sugg and Maney v. Dennison, both supra. In the Anderson-Tully case the facts were substantially as follows:

Anderson-Tully Co. laid claim to certain lands which had formed as accretion to land owned by the Chicago Mill & Lumber Co. The basis of the former's claim was that it had paid taxes for the requisite period of time on Fractional Section 17, Township 1 North, Range 6 East, which description had appeared on the original Government survey of 1824; as years went by, however, this fractional section had been entirely eroded away by the River and completely disappeared; accretions built up to the Northeast Quarter of Section 19, Township 1 North, Range 6 East, owned by the Chicago Mill & Lumber Co., and extended to a point where they occupied all of the geographical area originally occupied by Fractional Section 17; the Chicago Mill and Lumber Co. and its predecessors had paid taxes for the requisite period on the Northeast Quarter of Section 19, no mention being made of accretions. The cause was tried to this Court, and we held that the Chicago Mill and Lumber Company should prevail; on appeal we were affirmed. It was argued by Anderson-Tully, among other things, that our decision conflicted with Buckner v. Sugg and Maney v. Dennison;

in rejecting this contention the Court of Appeals, speaking through Judge Woodrough, said:

"It appears as to the Buckner case that the area there in controversy had not had the status of originally surveyed land in private ownership under legal description like Frl Section 17 of the original governmental survey here involved. It had not been lost to its original owner by being washed away and having the channel of the river located over it and then having new land form on the geographical situs by accretion to riparian ownership. It had emerged from a lake bed where it had not been subject to private ownership. After it emerged it was surveyed and became popularly known by appropriate designation given to it by the surveyor extending the existing survey and was so taxed. * * *

"In Maney v. Dennison, Dennison sued to eject Maney from land which Dennison claimed to own under tax title and as accretion to adjoining land owned by him. Maney had no paper title but claimed title by adverse possession. The court found the land in controversy to be accretion added to land conveyed to Dennison and that his tax title describing the land as it was popularly known was also prima facie evidence of Dennison's ownership. It found that Maney had not adduced sufficient evidence of adverse possession for the statutory period to justify submission of his claim to the jury. The question whether a riparian owner had been divested of his accretions through tax sale under description of land entirely washed away was not involved. * * *" 175 F.2d at page 739.

The descriptions upon which the defendants rely in the instant case are not descriptions of original land which was in existence at the time of the Government surveys but which had been washed away by the River, its situs later being occupied by accretions to riparian own-

478

ership, but are descriptions of accretions. as such. Hence, the situation before us is the same as that in Buckner v. Sugg and Maney v. Dennison, and is unlike the situation presented in Anderson-Tully Co. v. Chicago Mill & Lumber Co.

The conclusion which we have reached that the forfeiture of the Fractional West Half of the Southeast Quarter of Section 7 for non-payment of 1929 taxes did not carry with it the accretions lying east of the stream and that said accretions were not included in the State's tax deed to the plaintiffs renders it unnecessary for us to pass on the question of whether or not plaintiffs' tax title to the mainland and accretions lying west of the stream is valid. We might say, however, that the record pretty well establishes that the 1929 levy included a three-mill road tax which had not been approved by the voters of the county as required by law, which, if true, would void the sale, Fuller v. Wilkinson, 198 Ark. 102, 128 S.W.2d 251, and likewise that excessive costs were imposed, which would also void the sale, Edge v. Buschow Lumber Co., 218 Ark. 903, 239 S.W.2d 597.

 With respect to the defendants' counterclaim we are satisfied that the long-continued tax payments which have been mentioned are sufficient to vest title in the defendants by virtue of the provisions of Ark.Stats. Sections 37–102 and 37–103, and that the defendants are entitled to have the title to the area in controversy quieted in them according to their respective interests therein. Section 37–102 provides that payment of taxes on wild, unimproved, and unenclosed land for seven consecutive years under color of title shall be considered as actual possession thereof for such period; and Section 37–103 provides that payment of taxes on such lands "for a period of fifteen (15) consecutive years * * * shall create a presumption of law that (the taxpayer), or his predecessor in title, held color of title to said land prior to the first payment of taxes made as aforesaid, and that all such payments were made under

color of title". These statutes are more than statutes of repose; when their terms have been met, as we think they have been here, they operate affirmatively to vest title in the taxpayer. Paragould Abstract & Real Estate Co. v. Coffman, 100 Ark. 582, 140 S.W. 730, L.R.A.1915B, 1006; McFarlane v. Morgan, 157 Ark. 97, 248 S.W. 257. In Koonce v. Woods, supra, the Court, speaking of these statutes, said: " * * * By Act 66 of 1899, * * * payment of taxes on unimproved and unenclosed land under color of title for a period of seven consecutive years constitutes an investiture of title. Towson v. Denson, 74 Ark. 302, 86 S.W. 661, * * *. By subsequent legislation (Act 199 of 1929, * * *) one who pays taxes on wild and unimproved land for a period of 15 years has color of title as a presumption of law. These statutes, of course, are not limitation measures. They establish, in the one case, an investiture of title, and in the other there attaches color of title as a legal presumption." 211 Ark. at pages 447–448, 201 S.W.2d at page 752.

An order in accordance with the foregoing has been entered.