**USSERY et al.**

v.

**ANDERSON-TULLY CO.**

No. H-464.

United States District Court,
E. D. Arkansas, E. D.

June 9, 1954.

W. H. Daggett, Marianna, Ark., Hendrix Rowell, Pine Bluff, Ark., for plaintiffs.

Lamar Williamson, Monticello, Ark., for defendant.

LEMLEY, District Judge.

This cause, commonly referred to by Court and counsel as the "Red Fork Point Case", having been tried to the Court,[1] and the Court having considered the pleadings, exhibits, testimony and briefs, and being well and fully advised, doth hereby make and file herein the following Findings of Fact, Conclusions of Law, and Comment thereon, to wit:

### Findings of Fact.

1. This is an accretion case involving title to more than four hundred acres of wild, unimproved and unenclosed land, locally known as Red Fork Point; the area in controversy is located on a peninsula bounded on the East, South and West by the channel of the Arkansas River as it flowed in 1944 immediately prior to the functioning of the artificial 1945 Red Fork Cut-Off, which cut-off is depicted upon maps and aerial mosaics prepared by the Corps of Engineers of the United States Army since 1945. The channel above mentioned will be at times referred to herein as the "1944 River". The northern boundary of the area in controversy is the south line of Fractional Section 31, Township 8 South, Range 2 West, North of Arkansas River (NAR) in Arkansas County, Arkansas, as originally surveyed in 1840, or the thalweg of the channel of the Arkansas River if after 1840 that channel eroded northward into, and east and west across, Section 30, Township 8 South, Range 2 West, NAR. The actual area in controversy is that portion of said peninsula which lies within the geographical area which was originally surveyed by the United States Land Office in 1840 as the Fractional East Half of Section 3, Township 9 South, Range 2 West, South of Arkansas River (SAR) in Desha County, Arkansas, together with accretions thereto, if any.[2]

2. Plaintiffs are citizens of Arkansas, and the defendant is a Michigan corporation. The area in controversy is forested with valuable hardwood timber, and exceeds in value the sum of $3,000. One of the plaintiffs, Floyd Brown, claims no interest in the land itself, but he is the holder of a timber deed executed by the plaintiffs, B. S. Ussery et ux. Brown's

---

1. Because of the nature of this case it was necessary to try it in installments. The plaintiffs' proof was first taken and thereafter transcribed; at a later date the defendant's proof was similarly taken and transcribed; and at a still later date the rebuttal testimony was taken and transcribed. After the conclusion of all of the testimony the case was finally submitted on written briefs. The record before us is quite voluminous and includes a large number of maps and charts. The importance of the case to the parties, as well as the volume of work which counsel on both sides put in in preparing and presenting it to the Court, impels us to discuss the issues in some detail.

2. The Arkansas River, hereinafter called the River, is the boundary between Arkansas and Desha Counties. Arkansas County lies on the north side of the River, and Desha County on the south side. No further reference will be made to townships and ranges when speaking of either Section 3, Section 30, or Section 31. When other Sections are referred to, specific reference will be made to townships and ranges.

rights to the timber are, of course, dependent upon the validity of the claim of the Usserys to the land.

3. Certain facts have been stipulated by the parties, and the Court finds those facts as stipulated, whether hereinafter specifically referred to or not.

4. In the vicinity of Red Fork Point, both the north and south banks of the River were surveyed in 1840; at that time Section 3 was riparian to the south bank of the River, whereas Section 31, containing about 40 acres, was riparian to the north bank. Section 30 was located immediately north of Section 31, and appears to have been a full section containing 640 acres.

The Usserys have record title to Section 3 in Desha County, and they and their predecessors in title have paid taxes thereon in that County for more than 15 years. Defendant has title to Section 31 and to such portions of Section 30 as are here relevant, and it and its predecessors in title have paid taxes thereon in Arkansas County for more than 15 years.

5. It is the theory of the plaintiffs that after 1840 the River pursuing its customary course of channel change, eroded northward into Section 31 and across it until it reached a "line of maximum recession" in the South half of Section 30; and that in the course of this supposed northerly migration all of Section 31 and a portion of Section 30 were washed away and completely destroyed, being off-set by corresponding accretions to Section 3 on the original south bank.

They further contend that at some undetermined time between 1840 and 1897 an avulsion took place across the southern part of Section 3, leaving a portion of that Section, together with the supposed northern accretions thereto, on the north bank of the River as it flowed immediately after the supposed avulsion. They further contend that after this supposed avulsion the River migrated southward until it reached the position which it occupied immediately prior to the occurrence of the 1945 cut-off which has been mentioned, and that in the course of this subsequent migration southward accretions were formed to the portion of Section 3 which then was on the north bank of the River. Stated slightly differently, it is the plaintiffs' theory that the area in controversy consists of a portion of original Section 3, together with both northward and southward accretions thereto, all of which was located on the north bank of the 1944 River.[3]

6. The defendant, on the other hand, denies that the River ever eroded northward after 1840. It is its theory that subsequent to 1840 the River migrated southward and pursued an uninterrupted course of erosion in that direction until it reached the position which it occupied immediately prior to the occurrence of the 1945 cut-off, and that in the course of this erosion practically all of Section 3 was destroyed, and that the geographical location of the destroyed portions of said Section 3 was occupied by accretions formed to Section 31. Defendant contends further that even if it be conceded

3. There is no dispute about the location of the channel of the 1944 River. Said channel was located well to the South of where it had been in 1840. Nor is there any dispute that at least in recent years the River pursued a steady course of southward erosion to such an extent that it destroyed the Red Fork Revetment depicted upon the Red Fork Quadrangle Map issued by the Corps Engineers in 1935, and threatened the levee theretofore protected by this revetment. It was the destruction of the revetment and the threat to the levee and the lands protected by it that prompted the creation of the artificial cut-off to the northward in 1945. The functioning of this artificial cut-off caused the River to abandon the meander loop through which it had formerly flowed in this vicinity, and said loop is now a lake. In the course of its southward erosion above mentioned the River cut completely through Section 3 as originally surveyed and penetrated into Section 10, Township 9 South, Range 2 West; before the functioning of the 1945 artificial cut-off all of the East Half of Section 3 was completely destroyed, but a portion of the Southwest Quarter thereof was left in place and still exists.

that for a time after 1840 the River migrated northward so as to destroy all of Section 31, this course of erosion was checked in that portion of Section 30 owned by defendant and its predecessors, and that thereafter the River moved southward down to the position occupied by it immediately prior to 1945, building up accretions to Section 30.

7. The plaintiffs seek by their complaint and amendment thereto to quiet and confirm title to the area in controversy in themselves; defendant, on the other hand, has filed a counterclaim whereby it seeks to establish its alleged title to said area. The correct disposition of this case calls for a solution of the accretion problem posed by the conflicting theories of the parties, which theories have been outlined above; that is to say, the Court is called upon to determine from the evidence before it the nature and origin of the area in controversy. Of course, the burden is upon the plaintiffs upon their complaint to establish their ownership of the area by a preponderance of the evidence, and conversely, the defendant has a similar burden with respect to its counterclaim.

8. The Court is unable to find from a preponderance of the evidence that the area in controversy was formed in accordance with the theory of the plaintiffs, or that the plaintiffs are the owners of said area; the Court does find, on the other hand, from a preponderance of the evidence that said area did form as accretion to either Section 30 or Section 31, and that it is owned by the defendant.

More specifically, the Court finds in this connection that even if the River migrated northward to some extent after 1840 so as to destroy all of Section 31 as originally surveyed, its northward recession ceased while it was flowing through those portions of Section 30 owned by the defendant, and that thereafter the River migrated southward in an uninterrupted course of erosion until it reached the position occupied by it immediately prior to the occurrence of the 1945 cut-off, and that in the course of this southward erosion all of original Section 3 was destroyed, except the relatively small portion thereof remaining on the south bank of the River immediately prior to the occurrence of said cut-off. All of the land in controversy which is now in place on the original north bank and which occupies the geographical location of original Section 3 has accreted either to original Section 30 or to original Section 31, and is the property of the defendant.

### Conclusions of Law.

1. This Court has jurisdiction of this cause and of the parties hereto.

2. Since plaintiffs have failed to establish their ownership of the area in controversy by a preponderance of the evidence, their complaint must be dismissed with prejudice.

3. Since the defendant has established its ownership of the area in controversy by a preponderance of the evidence, a decree should be entered quieting title to said area in it, as against the plaintiffs.

### Comment.

As above stated, the ultimate issue in this case is the nature and origin of the area in controversy; we have found that the defendant's theory in that connection is correct, and we have rejected the opposing theory of the plaintiffs. Before discussing these respective theories we consider it desirable to make certain statements relative to the factual aspects of cases of this kind, which statements, we believe, are applicable not only to the instant case but also to accretion cases in general.[4]

In Bryant et al. v. Chicago Mill & Lumber Co., supra, we had occasion to say that the Mississippi River and some of its tributaries, including the Arkansas, are not stable streams as far as their chan--

4. Quite recently in Bryant et al. v. Chicago Mill & Lumber Co., D.C.Ark., 120 F. Supp. 463, we had occasion to state generally the legal principles involved in accretion cases, and since there is no material dispute here about the law, we deem it unnecessary to repeat those statements.

nels are concerned. Characteristically, these rivers are continually changing their courses by eroding their banks, and as erosion proceeds on one side of the stream, corresponding accretions or alluvial deposits are built up on the opposite side. One of the results of this erosive process is the creation of great bends flowing around long points or peninsulas which have been formed as the accretions built up to one bank follow and off-set the erosion and bank caving which is taking place on the other bank. These points or peninsulas can be, and frequently are, built out so far that they extend into and occupy the geographical location of lands formerly on the opposite shore, which, in the meantime, have been entirely washed away.

Given a course of erosion proceeding in one direction, there would, at first glance, seem to be no reason for that course not to continue indefinitely until the River in its migration encounters solid rock or other erosion resistant material; but, in fact, the banks on both sides of the River are friable, and as a point is being built up at the expense of the opposite bank, the stream is at the same time eating into the base of the very point which it is building up. This erosion into the bases of these points generally proceeds on both the upriver and downriver sides thereof, and causes them to become narrow necks of land; and when the necks are sufficiently narrow and conditions are propitious, the River cuts across them, thus materially foreshortening itself for the time being. This foreshortening greatly increases the velocity of the current in the vicinity of the cut-off and may induce significant channel changes both up and down river. Said foreshortening is, however, only temporary since the stream almost immediately begins the creation of a new point, and the entire process is repeated, as it has been repeated countless thousands of times from prehistory down to the present.

The action of the River in cutting across the narrow neck of a bend is known as a "cut-off", and in legal effect it is an avulsion; that is to say, after the cut-off has occurred there is left identifiable land in place on the opposite bank of the stream. Immediately after a cut-off takes place, the River has two channels, the short cut-off channel, and the old channel which it occupied prior to the cut-off, and which becomes inferior as a result of the avulsion. As time goes by, however, the ends of the prongs of the old channel tend to fill up by reason of sedimentation, and it is not long before that channel is completely abandoned by the River, except, perhaps, at high stages, and becomes a lake in the form of a horseshoe or ox-bow. A brief glance at any map of the bottoms of the Mississippi, the Arkansas, or the Red will be sufficient to demonstrate the great number of such lakes which have been formed by cut-offs down through the years.

A lake formed by such a cut-off will tend to dry up in time, the length of time required depending upon many factors which we need not stop to enumerate, but even after it has dried up, its contours remain upon the ground and may persist for hundreds of years, to be discerned either by the layman or by one skilled in the art. Indeed it may be said that wherever these rivers have been, at least in late prehistoric times, they have left ineradicable imprints upon the land.[5]

It has been customary to consider the process of the formation of accretions as being "gradual and imperceptible"; and it is true that the actions of these rivers in depositing soil which has been held in suspension are gradual and imperceptible. But it does not follow that the corresponding process of erosion is always such; on the contrary, it is frequently quite rapid and at times startling to view. Occasionally, large segments of bank cave into the river at one time carrying with them trees, vegeta-

5. There was evidence in the instant case to the effect that studies carried out a number of years ago in the Mississippi Delta have traced the various channel changes of that River back for a period of more than 2,000 years.

tion, buildings, and any living thing which may be so unfortunate as to be upon that particular portion of the bank at that particular time.

It has also been customary to consider that soil which is eroded away by the Mississippi and its tributaries is eventually carried to the Gulf of Mexico, and there can be no question that the delta at the several mouths of the Mississippi is being extended farther and farther out into the Gulf by reason of deposits of soil washed down from above. Recent studies, however, have shown that most of the soil which caves into the river is deposited on the next point on the same side of the stream; hence, the ultimate loss of soil may not be so great as formerly supposed.

The tendency of these Rivers to change their courses in the manner outlined above has created serious problems of land ownership, which the courts are called upon to decide. While these problems vary in detail, there are generally involved in them all the basic questions of how and when the area in controversy was formed; and in answering these questions the court is usually required to reconstruct the movements of the particular river involved from the time of the original surveys down to the time of the filing of the suit or until such time as the movement of the river ceased to be an important factor for consideration. In passing upon cases of this kind the court must rely upon expert testimony; the evidence of maps and charts of the stream and of the area in controversy;

physical evidence upon the ground, including significant features of terrain, the age and species of growing timber, and the distribution of timber types within the area; the testimony of lay witnesses when such is available; and any other evidentiary material which may be at hand. While the solution of some accretion problems is quite difficult, and while it is probably true that absolute certainty of solution is seldom, if ever, obtained, yet where, as here, the case is carefully prepared and the available evidence competently presented, a result can be reached, the accuracy of which is reasonably certain.

While these rivers in their courses of channel change move with tremendous power and destructive force, often more than sufficient to overcome the obstacles which man is able to place in their paths, nevertheless, they do not act arbitrarily or capriciously, for great as their power is, it is yet limited by the still greater natural laws of force and hydraulics, and they must act in obedience to those laws. Since such movements must be in obedience to such natural laws, it follows that they can be understood by those familiar with such laws and with their application to river behavior, and such persons, given adequate evidence and a reasonable opportunity for investigation, can with reasonable accuracy retrace the movements of the stream in question and its bank line history for quite considerable periods of time. This being true, the considered opinions of honest and duly qualified experts [6] are entitled to

6. In this field of work actual experience counts as much, or almost as much, as professional training. In this connection, in Chicago Mill & Lumber Co. v. Tully, 8 Cir., 130 F.2d 268, 272, Judge Woodrough described the task of solving the problem of the nature and origin of the area there in controversy as being one which involved "study of the maps and profiles prepared from surveys made at different times in the past and comparisons between conditions shown to have existed at different times and at the time of the work, study of the physics and hydraulics of the Mississippi river and comparisons between ascertained water levels and references back to the recognized government gauges, close observation and understanding of the terrain itself and all the physical indications of the actions of the river, as well as the character of all the tree growth". He then went on to say: "Study of the regimen of the river in any given period, that is, the relation of areas upon which the currents of the river worked to cave off its banks and the areas traversed more gently without eroding the banks (i. e., the points and bends), was also important and was considered. The tech-

great weight in cases of this kind. Unfortunately, in accretion cases, as in other types of litigation, the experts frequently disagree among themselves as to how certain phenomena should be interpreted, and when such a situation arises, the court is required to examine other available evidence to determine which expert, or set of experts, is more probably correct.

■ Accurate maps and charts are, of course, indispensable in cases like the instant one, since in most of such cases the crucial movements of the river have not been observed by living witnesses. If all of the maps of the Arkansas River were accurate in detail, and if the chronology of such maps were complete and close, solution of problems of this kind might be fairly simple in this area. Such, however, is not the case. What maps are available are far apart in point of time, and some of them are meager in detail. The official maps prepared by the Corps of Engineers or by the Mississippi River Commission, however, are accurate maps, and their depictions are prima facie correct. Crow v. Johnston, 209 Ark. 1053, 1059–1060, 194 S.W.2d 193.

■■ It is obvious that physical evidence on the ground is of the utmost importance in the determination of these cases; ordinarily, if the theory of one expert as to the nature and origin of the area in controversy is correct, it will find corroboration on the ground in the presence or absence of a lake, a meander scar, recognizable old bank lines, or other topographical features; on the other hand, a theory which is not supported by physical evidence is subject to grave doubt as to its correctness, regardless of the eminence of the potamologist who may propound it.[7] Where, as here, the primary question is the determination of which of two former river banks was the source of origin of the area in controversy, it becomes most important to consider the species and distribution of the timber throughout the area. This is true because timber does not spring up haphazard on newly formed lands, but follows a rather definite pattern of appearance, growth, maturity, death, and succession. The types of trees which first appear and establish themselves are known as "primary species"; those which follow are referred to as "secondary species"; and these, in turn, are followed by the "climax species" which will make up the permanent forest on the land as long as the climate remains unchanged.[8]

When accretions are formed in the alluvial river bottoms in the lower Mississippi Valley, they are at first simply mud and are devoid of vegetation. As time goes on, however, vegetation appears thereon and in time trees are established. The first species to occur are willow and cottonwood, which are tolerant of water, and which receive in such locations supplies of sunlight adequate to their needs; while willow and cottonwood are tolerant of water, they are intolerant of shade and will not establish successive stands in the same location. As the willow and cottonwood grow to maturity, the secondary species, such as sycamore, elm, hackberry, ash, pecan, and other types, which are more tolerant of shade, spring up beneath the willow and cottonwood, and as the latter disappear, the secondary species take over, to in turn give way to the climax species, usually, oak, hickory, or gum, the seedlings of which grow readily in the shade of their parent trees.

niques may only be mastered by hard work long continued." Id., 130 F.2d at page 273.

7. The science of river behavior is known as "potamology", and those who follow it are known as "potamologists".

8. See in this connection the article entitled "The Community of Trees" by Jesse H. Buell, Assistant Chief, Division of Forest Management Research, United States Forest Service, appearing in the 1949 Yearbook of the United States Department of Agriculture, pp. 103–109. See also Vogt, "The Road to Survival", William Sloane Associates, Inc., New York 1948, p. 87, et seq.

The length of time that it will take for this succession of timber types on newly formed lands to progress from the primary to the climax type of forest is obviously subject to considerable variation depending upon a number of factors, and it should always be kept in mind that the pattern is subject to some variation. It may be safely said, however, that once a forest is established on an alluvial deposit, it will proceed toward, and eventually reach, a climax in types, and its progress in that direction can be observed by the trained forester and in certain cases even by the layman.[9] The application of this principle to accretion cases can be summed up in the statement, "The timber follows the accretion"; that is to say, the land first formed is covered by the more advanced types of timber, and if the direction of the progression of the timber types can be ascertained, the relative ages of the various portions of the area can be logically inferred. In view of the importance to be attached to the forestation of the area in controversy in certain cases, it is clear that in such cases the testimony of experienced foresters and dendrologists ranks in importance with that of engineers and surveyors.

The testimony of lay witnesses having familiarity with the channel changes under consideration is of great value when it is available, and may be sufficient to tip the scale when expert testimony is evenly balanced. Included, to a limited extent, in the concept of "lay testimony" is contemporary nomenclature of areas of land or bodies of water, as indicating the local and contemporary understanding of the nature and origin of such areas or bodies; and local reputation as to land ownership may be entitled to weight.[10] It is not often, however, that reliable lay testimony is available, and it is becoming less so as time goes by.

Since the problem in cases of this kind is usually more historical than legal, and since such cases are usually

---

9. See authorities cited in Note 8, supra. The statements contained herein are likewise supported by the testimony of the forestry experts on both sides of the instant case.

10. In the Quandt Island Case (Banks v. Chicago Mill & Lumber Co., D.C.Ark., 92 F.Supp. 232, 240–241, this Court said: "If we were called upon to decide this question [the nature and origin of the area in controversy] upon expert testimony alone, we might not feel justified in holding that the evidence preponderated in the defendant's favor as to the true origin of the area. We are not required, however, to rely wholly on expert testimony for we have the benefit of lay testimony, including surveys made by local surveyors, all of which, when taken in connection with the testimony of Major [Austin B.] Smith, has led us to make a factual finding that Quandt Island is a true accretion to the [Spanish] Grant.

"This lay testimony establishes that prior to the Quandt Island Avulsion, * * * the area in controversy was solidly connected to the mainland portion of the Spanish Grant, and that one could walk from the area northeastwardly to Arkansas Post without crossing any water or any discernible channel until Post Bayou, which was immediately adjacent to Arkansas Post, was reached * * *. The lay testimony to the effect that one could proceed on dry land from the accretions to the mainland of the Grant, together with the fact that it was obviously the opinion of people living in the vicinity at the time, including experienced surveyors, that the area was in fact an accretion to the Grant, is not without weighty significance here. This testimony and the local reputation of ownership of the area furnish substantial corroboration to Major Smith's theory."

Likewise in a footnote to our opinion in Bryant v. Chicago Mill & Lumber Co., supra, we said: "In this connection we might say parenthetically that the fact that the West Fractional Half of the Southeast Quarter of Section 7 was separated from the rest of the area by a stream which was contemporaneously referred to as a chute tends, to a certain extent at least, to support the theory of the defendants that the area in controversy is an accretion to Islands 80 and 81, and to militate against the theory of the plaintiffs, * * *." (120 F. Supp. at page 470, footnote 6)

tried to the Court, which is ordinarily competent to give proper weight to the various items of evidence, the testimony may properly take a wide range, the Court admitting anything which has any rational tendency to throw light on the problem in hand. For example, in the instant case one of the exhibits introduced by the defendant was a reproduction of a map of Arkansas Post and vicinity, including the geographical location of the area in controversy, which had been cut out of the Memoirs of General William T. Sherman, written soon after the Civil War;[11] and we recall that in the Quandt Island case, above referred to, one of the items considered by Major Austin B. Smith in formulating his theory as to the formation of Quandt Island was a military map prepared by Union officers in connection with the expedition against Arkansas Post in 1863;

said map was not, however, formally introduced in evidence.[10]

With these principles (all of which were involved in the instant case) in mind, we now proceed to a consideration of the particular controversy before us:

In support of their theory that Red Fork Point was formed as a result of a northward migration of the River followed by an avulsion across the southern part of Section 3, which was followed in turn by a southward recession of the stream to the point which it occupied prior to the functioning of the 1945 cutoff, the plaintiffs rely upon the testimony of Mr. Claude G. Dunne,[13] County Surveyor of Desha County, and upon that of their forestry expert, Mr. W. L. Lear.[14] Defendants in support of their theory rely upon the testimony of Mr. Thomas L. Strode, County Surveyor of Arkansas County,[15] Mr. Oscar S. Rodg-

11. This map appears immediately following page 292 of Volume 1 of Memoirs of General William T. Sherman, second edition, revised and corrected in two volumes, New York, D. Appleton and Company, 1904, and is entitled "Arkansas Post captured January 11, 1863".

12. The expedition against Fort Hindman at Arkansas Post was under the command of Major General John A. McClernand, and General Sherman was in command of his infantry. Whether the map considered by Major Smith in the Quandt Island case, but not introduced in evidence, was the same map as that introduced in evidence in the instant case we do not now recall.

13. Mr. Dunne has had no formal engineering training, except to the extent that his taking a surveying course and certain courses in mathematics at Arkansas A. & M. College at Monticello can be considered as such; he is a "practical surveyor", but he does not pursue surveying as a full time vocation. While Mr. Dunne stated that he had tried to solve accretion problems before, he admitted that this was the first accretion case in which he had ever been called upon to testify. While no objection was made as to his qualifications, and while he was doubtless sincere in formulating and propounding his theory, his lack of training and experience has a serious adverse effect on the weight to be given to his opinions when opposed by those of the

defendant's experts who will be hereinafter mentioned.

14. While Mr. Dunne's qualifications are open to question as above noted, there can be no question that Mr. Lear is a highly trained and well qualified forester. He received his technical training at Purdue University and Alabama Polytechnic Institute and has been particularly interested in Bottomland Hardwood; he was considered sufficiently an authority on the subject to be offered the position of head of the Bottomland Hardwood Branch Station of the Southern Forest Experiment Station in 1945. He has been employed by the Arkansas Forestry Commission, Alabama Polytechnic Institute, and the United States Forest Service. At the time he testified he was, and presumably at the present time still is the Technical Assistant to the manager of the Sawmill Division of Crossett Lumber Company. He is a senior member of The Society of American Foresters, and a charter member of The Forest Products Research Society.

15. Mr. Strode is a practical surveyor of many years experience and devotes practically his whole time to this occupation; he has had intimate personal acquaintance with the area in controversy since childhood. Moreover, he has had at least some experience in cases of this kind, having testified for the plaintiff in the Cook's Point Case (Kimble v. Willey, D.C.Ark., 98 F.Supp. 730); we were fa-

ers of Memphis, Tennessee,[16] and Major General Max C. Tyler, United States Army retired,[17] as their engineering experts. It also relies upon the testimony of Mr. John A. Putnam of Leland, Mississippi as their forestry expert.[18] Defendant also called as witnesses Mr. W. E. Houser, its Land Superintendent, and Mr. Walter H. Guyer, one of its foresters. Both of these men are capable and experienced foresters, and both are thoroughly familiar with the area in controversy.

When the plaintiffs' theory of the case is considered purely as a theory, there is nothing inherently wrong with it. That is to say, if we should examine a composite map of the original surveys of the north and south banks of the River, we would see that the south bank was convex in shape, whereas the north bank was concave, and from this we might infer that at that time the north bank was caving whereas accretions were being built up to the south bank; and we might rationally predict that, other things being equal, this erosion of the north bank would continue until Section 31 was destroyed and Section 30 was penetrated by the River; and we might further predict that in the course of time the base of the point being built out from the original south bank would be eroded from both the upstream and downstream sides until it became a narrow neck, and that eventually the River would cut across it, leaving a part of Section 3 as original land in place on the north bank of the River. As indicated, such has happened hundreds of times along the River, and will doubtless continue to happen unless and until some satisfactory method of

vorably impressed with his testimony in the case last mentioned. as we have been with his testimony in the instant case.

16. Mr. Rodgers is a well trained engineer of long experience in work along the Mississipi River; he is a member of the National Society of Professional Engineers; and has been employed by the Mississippi River Commission and by the Corps of Engineers. In the course of his work he became familiar with government maps and charts and is well qualified as a map maker and reader. He was closely associated with the late Mr. St. George Richardson of Memphis, and this association was particularly close during the last three years of the latter's life. It might be said in this connection that Mr. Richardson was an engineer who was peculiarly well qualified to solve accretion problems; his death was a severe loss to the profession.

17. General Tyler was aptly referred to in the Quandt Island Case by one of the attorneys therein, who is also of counsel in this case, as the "Old Master". He was graduated from the United States Military Academy in 1903 and was immediately assigned to the Corps of Engineers where he served with distinction until his retirement a few years ago. In the course of his service he became a recognized international expert on river behavior, and for his services he was awarded the Distinguished Service Medal twice and the Legion of Merit. He was President of the Mississippi River Commission from 1939–1945, having charge of all works for navigation and flood control from Cape Girardeau, Missouri, to the Gulf of Mexico on the Mississippi River and its tributaries, including the Arkansas. He has served as a consultant to many public and private interests since his retirement. The Court considers him to be one of the foremost living authorities in his field.

18. Mr. Putnam is likewise an outstanding man in his field, which is southern hardwood forestry, and has published quite a number of papers relating to the subject. He is presently head of the Delta Branch of the Southern Forest Experiment Station at Stoneville, Mississippi, and is also the bottomland expert and consultant for extension work in the Division of State and Private Forestry Cooperation of the Southern Administrative Region of the U. S. Forest Service. He studied forestry at the University of Michigan and has a degree of Bachelor of Science from that institution, which was awarded to him for outstanding work in his profession, although lack of a year of residence and a semester of credit prevented him from formally graduating. Since leaving school in 1923 he has been continuously engaged in the practice of his profession with fourteen years spent in the various phases of the hardwood lumber business, other forest industry, and in forestry consultation and promotional work, and sixteen years as an officer of the U. S. Forest Service.

bank stabilization is achieved and placed in operation on an extensive scale.

Were we to make such a prediction, however, we should also predict that upon the occurrence of the avulsion unmistakable and easily identifiable evidences thereof would be left upon the ground, particularly if, as Mr. Dunne theorizes, the avulsion took place as late as the period between 1874 and 1897; we also feel that some record of such avulsion would be discernible upon existing maps and aerial mosaics. There is no such evidence, however, either on the ground or on the maps, and, on the other hand, we are satisfied that the available map evidence and the physical evidence on the ground refutes the plaintiffs' theory and establishes the validity of that of the defendant. Otherwise stated, while it may be that the area in controversy could have been formed in accordance with the plaintiffs' theory, the evidence before us is to the effect that it was not so formed.

It is our opinion that Mr. Dunne in formulating his theory made an error in identification of certain features of terrain north of the River as it was originally meandered, that he was misled by the so-called Sickels Map of 1874, and that he came to his conclusions in ignorance of the existence of the Taber Map of 1884–85, which map, to our mind, negatives the idea that an avulsion occurred in this area at the time or along the lines suggested by Mr. Dunne.

From a topographical standpoint Mr. Dunne bases his theory primarily upon the existence in the south part of Section 30 of what he believes to be an old river bed, and which he believes to be the line of maximum recession to the north which was achieved by the River prior to his supposed avulsion. From his observations he came to the conclusion that not only the north bank but also both the high and low water south banks of this supposed old river bed are still in place, and that the two south banks could not have remained in place absent an avulsion to the south. In other words, Mr. Dunne contends that had the River migrated north and then simply changed the direction of its erosive course, as it can and frequently does do, and migrated to the south, these two south banks would have been washed away.

In the last analysis, Dunne's theory depends for its validity upon the correctness of his identification of these features of terrain as old river banks, particularly his identification of the supposed south banks. If he is correct, then obviously the River could not have eroded southward and left its south banks in place. (A southward migration would not have affected the north bank at the line of maximum recession; but, as indicated, it does not help the plaintiffs here for us to find a northward migration followed by one in a southerly direction.) We are unable to find, however, that Mr. Dunne's "south banks" are in fact such; rather, we are satisfied from the evidence that they are nothing more than two of a series of "accretion ridges" such as are found all over the Arkansas River bottoms and are due to the action of the River in building up along its banks "natural levees" higher than the adjacent ground; the migrations of the River leave a series of these elevations with valleys between, and as one approaches the River at right angles across newly formed land, one crosses a series of these ridges. According to the testimony of Mr. Rodgers and of other witnesses, whom we credit, Mr. Dunne's "banks" lack the stature and continuity of true river banks which one would normally expect to find if they had in fact been banks as late as 1874, which is the approximate date at which Mr. Dunne theorizes that the River reached his supposed line of maximum recession.

Mr. Dunne also undertook to locate upon various maps which were introduced in evidence the course which his supposed avulsion took through the southern part of Section 3 after the River reached his supposed line of maximum recession, but again the evidence on the ground fails to bear him out. Had an avulsion taken place across said Section and had the River thereafter migrated southward, we would expect to

find in place at least the vestiges of the north bank of the River as it ran immediately after the avulsion, but there is no trace of any such bank. As stated, the area in controversy is traversed by a series of accretion ridges, but there is no such change of elevation in the area as would indicate an old bank line at or near the point where one would normally be encountered if Mr. Dunne's theory were correct.

A more obvious objection to Dunne's theory, however, at least in our estimation, and one which has impressed itself upon our mind since an early stage of these proceedings, and which we called to the attention of counsel in the early days of this litigation, stems from the fact that had an avulsion taken place across the southern part of Section 3, we should normally expect to find an ox-bow lake along his line of maximum recession and occupying the location of his supposed 1874 channel; but there is no lake there and no evidence that there has ever been one in that location. While we are not prepared to say that the formation of an ox-bow lake is a necessary concomitant to all avulsions, nevertheless we know of no case where such an avulsion as Mr. Dunne postulates has occurred without the formation of such a lake, and the absence of a lake in the instant case militates most strongly against Mr. Dunne's theory. It should be kept in mind in this connection that Mr. Dunne does not theorize that the avulsion occurred prior to 1874, and while, as stated, these lakes do dry up in time, they do not ordinarily dry up and completely disappear in 70 years. Certainly, had such a lake existed at any time after 1874, it must have persisted to a time within the memory of numerous living witnesses, e. g., Mr. Strode who has been familiar with the area from childhood, but the plaintiffs adduced no proof to establish the existence of such a lake at any time.

In concluding that the River migrated northward after 1840, Mr. Dunne was evidently strongly influenced by the Sickels Map of 1874; not only does he concede that he relied upon said map, but it is significant that he dates his line of maximum recession as around 1874, which was the year in which Mr. Sickels made the reconnaissance upon which his map was based. It was demonstrated to us in the Cook's Point case, and it has again been demonstrated in this case, that said map is not a safe tool to use in trying to reconstruct channel changes on the River, except in very limited circumstances. We do not stop now to discuss in detail the deficiencies in the Sickels Map; suffice it to say that it was not based upon a controlled survey, but was a sketch map based upon a hasty reconnaissance undertaken by Mr. Sickels, not for navigational purposes, but for the purpose of recommending a system of levees on the south bank of the River. Said map does not conform to the scale set forth in the legend, and to further complicate the situation it has superimposed on it certain vertical and horizontal lines which would normally be taken to represent township and range lines, but which are not such; although Mr. Dunne assumed that they were.[19] In view of the demonstrated deficiencies in this map, it is of no practical value in solving a detailed problem such as is before us, and reliance upon it is apt to be misleading, as it was to Mr. Dunne.

Finally, Dunne at the time he formulated his theory had no knowledge of the existence of the Taber Map of 1884-85. The Taber expedition was no mere reconnaissance but was a controlled survey conducted by a substantial party of men; the party not only surveyed the banks of the River and took soundings, but also took the overbank topography for two miles back from the River, and the Taber Report specifically states that abandoned river channels still connected with

19. The Court made the same erroneous assumption at one stage of his consideration of the Cook's Point case, but later discovered the error.

the main stream were examined. This map shows that at the time of the survey the River was running substantially south of Section 31, as originally surveyed, and that it was eroding its south bank. There is no evidence on this map from which it can be inferred that the River was running along Mr. Dunne's supposed line of maximum recession in 1874 or at any other time; nor is there any evidence on this map that an avulsion had occurred along Mr. Dunne's suggested line. Had such an avulsion occurred after 1874, as he theorizes, it is inconceivable that evidence of it would not have been present on the ground, and it is equally inconceivable that it would not have been shown upon the map. On the other hand, the map shows a cultivated field located where Mr. Dunne says that the River was running in 1874; while abandoned channels of the River do in time become fit for cultivation, they do not do so within 10 or 11 years. There is still evidence of this old field on the ground, and the timber growing in the area occupied by the field at the time of the Taber Survey is not such as we would expect to find occupying an abandoned river channel which was active as late as 1874, the timber being principally pecan, box elder, hackberry, and a few sycamore, all secondary species.

As stated, the plaintiffs also rely upon the testimony of Mr. W. L. Lear, whose qualifications have been mentioned; Mr. Lear agreed with Mr. Dunne that there is still original land in place in Section 3 to the north of the 1944 River, and he further agrees that after 1840 the River moved north rather than south; he did not attempt, however, to give a detailed bank line history of the River in this area. With all due respect to Mr. Lear's ability as a forester, we do not believe that the data which he observed support the conclusions which he drew; in our estimation his testimony is outweighed by that of the defendant's witnesses generally, and by that of Mr. Putnam, Mr. Guyer, and Mr. Houser in particular.

Mr. Lear made three visits to the area in controversy, in the course of which visits he examined the timber growing thereon; he cut down eight trees and made ring counts to determine their ages, and he also took borings from 28 other trees growing along a line running north and south across the area.[20] The oldest tree which he particularly examined was a cottonwood about 100 years old, located outside of the area in controversy and just north of the 1840 bank of the River; the youngest tree which he examined was a hackberry approximately 19 years old growing in the southern part of the area. He also found a 93 year old cottonwood located within the channel of Mr. Dunne's supposed 1874 River, and a willow with 54 growth rings growing between Dunne's supposed "high water south bank" and his supposed "low water south bank".

With reference to the ages of particular trees in the area, it should be first said that Mr. Lear made his original examination in 1952, 112 years after the government survey; and had he been able to locate any trees within the area more than 112 years old, the existence of such trees would have constituted conclusive proof that the land on which they were growing had not been disturbed since the original surveys. No trees of that age were found, however, and without stopping to discuss in detail the particular trees examined by Mr. Lear, we may say that while, generally,[21] the

20. The tool used by him is known as an "increment borer". Mr. Lear described this tool as being "a small auger with which you can bore into a tree and take a core of the cross section, from which you can count the annual rings of growth and determine the age". The value of this instrument in forestry is obvious since the only way in which the exact age of a tree can be determined is by a count of the annual rings; when an increment borer is used, this count can be obtained without damaging the tree.

21. As pointed out, Mr. Lear found a 93 year old cottonwood growing in Mr. Dunne's supposed 1874 channel. Had

ages of such trees are consistent with the plaintiffs' theory, said ages are also consistent with the theory of the defendants.

Mr. Lear based his opinion that part of original Section 3 was still in existence north of the 1944 River primarily upon his observation of a belt of timber described by him as a "pecan and sycamore ridge" along which he said that he noticed no cottonwood, and upon a group of trees to the north of this ridge which he considered to be overmature cottonwoods.[22] He testified that the soil upon which these cottonwoods were growing had the appearance of being "a buckshot land; it was not typical river sand, or sandy loam, it was a relatively heavy soil". He further testified that the root crowns of these cottonwoods were visible above the ground, which fact indicated to him that "there was no new accretion".[23]

Taking up first the "pecan and sycamore ridge" along which Mr. Lear failed to notice any cottonwood, it may be stated that after Mr. Lear had testified, Mr. Houser and Mr. Guyer went over the area in controversy following Mr. Lear's footsteps; both of these men are well qualified foresters, and both are intimately familiar with the entire area. Mr. Guyer testified that in his opinion the trees examined by Mr. Lear did not represent a fair sample of the timber growing on the area; while he conceded that there were pecan and sycamore trees on Mr. Lear's ridge, he also stated that there was cottonwood growing in the same locality, and that he believed that when the ridge is examined to any extent "there is as much cottonwood there as any place else".

With regard to the cottonwood which Mr. Lear considered to be overmature and to the presence of which he gave considerable weight in formulating his opinion, one would consider that he would normally have paid particular attention to this group of trees and would have made a diligent effort to obtain the exact ages of some of them. But he did not cut a single one of these trees, and he only bored two cottonwood while traversing the area which he considered to be original land. One of these he found to be 52 years old plus, and the other to be somewhat over 48 years old; thus, neither of these two trees was overmature under his own definition of the term. He did note one particular tree having a breast high diameter[24] of forty-four inches which he considered to be overmature; but he did not bore this tree, and his opinion that it was overmature means simply that it was anywhere from 75 to 125 years of age, which is too indefinite to be of any value here. Moreover, Mr. Lear testified that there had been no cutting in this area of overmature cottonwood, and that "there was practically as much fallen cottonwood

---

the River actually been running in that channel in 1874, it would be physically impossible for a tree of that age to be growing there in 1952. Such a tree would have been a seedling in 1859, only 19 years after the original surveys; during this 19 year period the River would have had to have migrated from its 1840 channel to its line of maximum recession, Mr. Dunne's supposed avulsion would have had to have taken place, and the lake which would almost inevitably have been formed by such avulsion would have had to have filled up to such an extent that a cottonwood could grow within its bounds. That all of these things could have taken place in the short period of 19 years is highly improbable, if not physically impossible.

22. As to what constitutes an "overmature" cottonwood, Lear testified: "Cottonwood begin to mature about 70 to 75 years; by 100 to 125 years it is pretty well gone; I mean the stands have been pretty well opened up, that is, by trees going down unless there has been a cutting." It will thus be seen that there is quite a wide margin allowed for estimate of the exact age of a cottonwood which gives the appearance of being overmature.

23. He stated in this connection: "Now, on accretions, usually you will find a deposit around the trunk of your trees at the ground line, and you don't see these root crowns, they are covered up by deposits."

24. Four and one-half feet above the surface of the ground.

lying on the ground as there was standing. It was going down fast." Mr. Guyer testified, however, that after Mr. Lear's testimony was taken, he and Mr. Houser counted trees in strips 66 feet wide from Lear's area of overmature cottonwood to Dunne's most southern "high bank", and that they found 19 cottonwood standing, one dead on the ground, and one dead but still standing. As to the soil in which these overmature cottonwood were growing little need be said since it is common knowledge that buckshot soil frequently appears throughout the bottoms in the Mississippi Valley; nor do we attach significance to the appearance of the root crowns of these trees above the ground as it is not contended here by the defendant that the area in controversy is made up of particularly "new accretion", and ample time had elapsed since 1840 for the root crowns of these trees to become uncovered.

While we think highly of Mr. Lear's qualifications as a forester, we believe that he based his conclusions on insufficient data, and further, that he paid undue attention to particular trees, the ages of which turned out to be inconclusive, and too little regard to the overall pattern of timber distribution throughout the area. Moreover, as indicated, some of his factual statements have been contradicted by the testimony of Mr. Guyer, who is more familiar with the area than Mr. Lear, and who, moreover, went over the ground after the taking of Mr. Lear's testimony.

It is argued in the plaintiffs' brief that the presence of pecan and sycamore timber of merchantable size on part of the area in controversy establishes that this land is at least 125 years of age and hence was in place prior to 1840; the fallacy of this argument is that it appears to be based on the assumption that the pecan and sycamore could not reach such size until after the cottonwood was completely gone; such is not the case. Secondary species of timber spring up in the shade of the primary species and begin to establish a stand while the earlier trees are still growing; of course, the earlier species remain dominant for a period of time, and it is only after they reach maturity and begin to disappear that the secondary species become dominant in a given area. It takes no more than a casual walk through any stretch of woods in which pine, for example, an intolerant species, is dominant, to see that the more tolerant hardwoods are growing under the pine which will in the course of time give way to them.

In view of what has been said about the testimony of Mr. Dunne and Mr. Lear we think it clear that the plaintiffs have failed to prove the validity of their theory of the true nature and origin of the area in controversy; but this is not dispositive of the case; it remains to be considered whether or not the evidence affirmatively establishes the validity of the defendant's theory so as to justify the rendition of a decree quieting title in it. We think that it does.

It is the considered opinion both of Mr. Rodgers and General Tyler that subsequent to 1840 a point began to build out to the northeast from the southern bank of the River in Section 32, Township 8 South, Range 2 West, which point is clearly depicted upon the Red Fork Quadrangle Map of 1935 to which we have referred and is located immediately south of that stretch of River denominated "Morgan Bend";[25] that the es-

25. Mr. Rodgers based his opinion upon a detailed study of available maps and charts and upon extensive ground surveys and reconnaissances; General Tyler drew his conclusions from his studies of the available maps and from his vast knowledge of river behavior. In the course of his testimony he had occasion to say: "Now, it seems to me that the business of filling in between surveys from known characteristics of river behavior, and our observations, and especially in similar cases, it is very much like the way the archaeologists reconstruct something from foundations they find of an old fort, or maybe a mound, broken pottery, weapons, burials, things like that—they reconstruct a very convincing story of that very ancient site.

tablishment of this point on the south bank of the river,[26] accompanied by a corresponding northward erosion of the stream, had the effect of deflecting the current against the south bank of the River in Section 3, and that said south bank was eroded away in a continuous course of erosion until the 1944 channel of the River was reached. In stating his opinion, General Tyler called attention to the 1840 meander of the River through Sections 25 and 26, Township 8 South, Range 2 West, on the north bank of the River, which meander shows a small "kink" to the northeastward. General Tyler then goes on to say: "This kink became Morgan Bend, and the further it went into the land (on the north bank of the river), the more it took out, and the further it got back in, the more it threw the current south against the south bank, and the material out of the bend eroded this bank and this material lodged on this point, so that we had a point—a new point building out from the north toward the south, as Morgan Bend went back in to the north, and as the new south bank was caving away." The General further testified that the Red Fork Point involved in the instant case is an entirely different peninsula from the Red Fork Point which existed in 1840; the latter point was somewhat downstream on the south bank of the River, and it completely disappeared sometime prior to 1885; he was of the opinion that the disappearance of the old Red Fork Point was "related to the cut-off which occurred prior to 1885 in the bend which is now called Garland Lake. The River went around through what is now Garland Lake and gradually narrowed the neck until, probably in 1884, just prior to this (the Taber) survey, there was a cut-off * * *. There was a cut-off through this neck, and as a natural cut-off always occurs at the narrowest place in the neck, it creates a great deal of disturbance right at the cut-off. The river gets kinked up and doesn't know just what to do. It passed through that gap at tremendous velocity. All the fall, which normally went around here, as soon as that broke through and widened, was concentrated first, at the break, then gradually distributed itself upstream. That increased the velocity upstream very materially, and pulled this point out of here."

The validity of the theory of General Tyler and Mr. Rodgers is, in our opinion, adequately established by the Taber Map of 1885 and subsequent maps, and by the physical evidence on the ground, particularly the distribution of timber throughout the area as noted by Mr. Putnam and as graphically portrayed by him upon the map which he prepared and which was introduced in evidence.

The area in controversy, as it existed in 1885, is depicted upon Sheet 17 of the Taber Survey; while this map is not a sectionalized map, the area is readily identifiable by reference to Belcoe Lake which appears on said Sheet 17 as "Belco Lake", and which appeared on the original Government surveys as being located on the south side of the River in Sections 4, 5, 8 and 9 of Township 9 South, Range

Well, we tried to do that here." In this connection it occurs to us that the science of archaeology might be of value at times in solving some of our accretion problems. It is a fact well known to North American archaeologists that pre-Columbian artifacts and burials have been found in certain parts of the alluvial soil of all of our Arkansas river valleys, and, in at least one instance, positive stratigraphic evidence of the residence of a pre-historic group other than those whose immediate descendants were living at the time of the coming of the Spaniards, have been found. Dis-

coveries Indicating A Pre-Caddo Culture On Red River In Arkansas, Bulletin of the Texas Archaeological and Paleontological Society, Vol. 8, Page 25. The discovery within the area in controversy in a case of this kind of such artifacts in place, or burials, would conclusively demonstrate that such area was land in place at the time of the original government survey.

26. The point now under discussion is not to be confused with the point shown on the 1935 Quadrangle as "Morgan Pt."; the latter point is slightly upriver and is on the north bank of the stream.

2 West; the area in controversy is located Northeast of said Lake. The Taber Map shows, as heretofore indicated, that in 1885 the River was running south of the south line of Section 31, as originally surveyed, and that a point was building out in a southerly direction; thus, at that time the River was clearly eroding into original Section 3. Further examination of this map shows that just upstream from the point last mentioned, there was a point on the south bank of the River which was building out to the northeastward; now, if we compare the Taber Map with the Red Fork Quadrangle of 1935, we see that this point on the south bank of the River, which had obtained some stature by 1885, is the point around which the River was flowing in 1935 in the reach designated as "Morgan Bend" on the Quadrangle Map, and about which General Tyler testified. As we have heretofore pointed out, there is nothing on the Taber Map which indicates a northward recession of the River in this area. Moreover, the existence of the old field which has been mentioned and which is located in the northern part of the area in controversy is more consistent with a southerly erosion of the River than with a northerly migration thereof. That the southern migration of the River which was in process in 1885, as shown on the Taber Map, continued uninterrupted until the functioning of the 1945 cut-off, is abundantly established by a number of maps and aerial mosaics prepared subsequent to the date of the Taber Map, and there is no evidence that there was any change of the direction of the River's erosion between the two dates last mentioned.

While the theories of General Tyler and Mr. Rodgers are corroborated by the map evidence above discussed, we believe that still more convincing corroboration is to be found in the testimony of Mr. Putnam as to the timber distribution throughout the area. Mr. Putnam made a most thorough examination of the ground, aided by a detailed plat of the area prepared by Mr. Strode, which he carried with him during his reconnaissance. Mr. Putnam came to the conclusion that the oldest timber in the area consisted of remnants of oak and gum, climax types, located north of the Section line between Sections 31 and 30, and immediately south of an embankment traversing Mr. Dunne's supposed 1874 River, which embankment is referred to as an old road by the plaintiffs and as an old levee by the defendant.[27] Mr. Putnam fixes the age of the land upon which oak and gum timber were located as 200 years and upward. South of this area he found a belt of timber composed of very old cottonwood from 90 to 100 years of age; south of that he found relatively old cottonwood from 60 to 70 years of age, and south of that he found young cottonwood and willow extending down to the 1944 River. His findings are depicted on his map by colored belts showing a regular downward progression of timber age from north to south.[28] And he testified that to him it was quite apparent that the age of the land was roughly parallel to the development of the timber types and went from northwest to southeast. He also noticed

---

27. Mr. Rodgers thought that this embankment was an old levee built in slavery times to afford protection against the backwaters of the Mississippi River which ascend the Arkansas when the latter is at a low stage as compared to that of the former. Of course, if the embankment is the remains of a levee antedating the Civil War, then it would have been impossible for the River to have occupied the course suggested by Mr. Dunne since had it done so, this embankment would not have remained in place.

We do not definitely decide, however, whether said embankment was originally a road or a levee, nor do we undertake to determine its age.

28. Of course, Mr. Putnam observed the various secondary species of timber growing throughout the area, but he was apparently of the opinion, with which we agree, that timber age throughout the area progressed downward from north to south in line with the downward progression of the cottonwood.

a number of accretion ridges throughout the area and found that they paralleled the belts of timber shown on his map.[29] At the conclusion of his direct examination Mr. Putnam was asked whether or not it would have been possible for the area south of the embankment which has been mentioned and extending down through the Section line between Sections 30 and 31 to have been a river bed in 1874; he replied: "I don't see how it could have been possible. The age of the trees, which we actually verified, the trees themselves would carry back to that date, leaving no time for the river to have gotten out of the way, and the trees to seed in."

While Mr. Putnam's findings generally coincide with the theories of General Tyler and Mr. Rodgers, it should be noted that there is one point of difference, which in the instant case happens to be unimportant. As pointed out, Mr. Rodgers and General Tyler are of the opinion that after 1840 the River commenced an erosion of its south bank which continued until the 1944 River was reached. They make no allowance for any northward recession of the River at all; Mr. Putnam testified, however, that the only original land which he found was north of the Section line between Sections 30 and 31. Under certain circumstances this difference might be important as far as the defendant's title to the area is concerned, but in the instant case it is immaterial, because, as stated in our Findings of Fact, even if the River did migrate north for a time, this northward erosion had ceased while it was running through lands owned by the defendant's predecessors in title, and by 1885 it had commenced a course of southward erosion which continued uninterrupted until 1945.

In further support of its theory the defendant relies upon certain profile lines run by Mr. Rodgers across the area in controversy from north to south and upon certain lay testimony. Without stopping to analyze these profile lines in detail, it may be said that they show the various elevations from north to south throughout the area in controversy, and from them it appears that said area consists of a series of more or less distinct accretion ridges with low places or "swales" between them; we find no great variations of elevation such as we would expect had a river channel cut through said area. Moreover, we note from these lines that the elevation of the area rises steadily toward the 1944 River, which we would normally expect if the land were formed in accordance with the defendant's theory, in view of the tendency of the River, which has been mentioned, to build up "natural levees".

Defendant also introduced the deposition of Mr. C. L. Morgan, a layman, who was born around 1872 and spent his childhood years and youth in the general vicinity of the area in controversy. Mr. Morgan deposed that he had never heard of the River eroding north into Section 31 in this vicinity; as far as he knows it always eroded south. While the deposition of Mr. Morgan is of little concrete help in solving the accretion problem with which we are faced, it does serve to furnish us with some local color and human interest. Mr. Morgan recalled that when he was a small boy he was told that the Garland Lake Cut-off, which has been mentioned, occurred in 1876, and that a steamboat, which was coming around the bend when the avulsion occurred, was sunk in the ox-bow lake formed by the cut-off, and that the lake took its name from this boat, the "Garland". He further recalled seeing this boat many times as a boy; evidently it was raised after the waters subsided.

Our determination that a preponderance of the evidence shows that the area in controversy was formed as true ac-

29. As to "belts" of timber in alluvial areas, Mr. Putnam testified that cottonwood is "always seeded in at one time", and, "there will be a zone of timber, and within zones there may be one age

* * *. Proper river stages don't occur every year, only maybe five or ten years. There is a difference in age between zones".

cretions to either Section 30 or Section 31 renders it unnecessary for us to state or consider the alternative contention of the defendant that it is the owner of said area as a matter of law, regardless of its nature and origin.

Let a decree be entered dismissing the plaintiffs' complaint and quieting title to the area in controversy in the defendant.