GREIF BROS. COOPERAGE CORPORA-
TION, a Delaware Corporation,
Appellant,

v.

UNITED STATES GYPSUM COMPANY,
an Illinois Corporation, Appellee.

UNITED STATES GYPSUM COMPANY,
an Illinois Corporation, Appellant,

v.

GREIF BROS. COOPERAGE CORPORA-
TION, a Delaware Corporation,
Appellee.

Nos. 17569, 17570.

United States Court of Appeals
Eighth Circuit.

Feb. 9, 1965.

Rehearing Denied Feb. 23, 1965.

W. H. Daggett, of Daggett & Daggett, Marianna, Ark., for Greif Bros. Cooperage Corp.

George K. Cracraft, Jr., Helena, Ark., for United States Gypsum Co.

Before VAN OOSTERHOUT, BLACK-MUN and MEHAFFY, Circuit Judges.

MEHAFFY, Circuit Judge.

United States Gypsum Company brought this action against the Greif Bros. Cooperage Corporation in the United States District Court for the Eastern District of Arkansas to quiet title to separate tracts of land in Desha County, Arkansas and for damage by trespass for the removal of timber from one of the tracts.

The two, noncontiguous tracts of land in dispute are located near the bank of the Mississippi River in areas designated by the last Government Survey of 1846 as Sections Twenty-Two (22) and Twenty-Three (23), Township Eleven South (T 11 S), Range One West (R 1 W), respectively.

The District Court found for Greif Bros. as to the tract in Section 22 and for Gypsum as to the tract in Section 23. Each party has appealed from that part of the decree adverse to it.

Jurisdiction is established by diversity of citizenship and the amount involved.

Because the legal issues differ with respect to each tract, we will separately discuss the parties' adverse claims of ownership.

### SECTION 23 TRACT

The Government Survey of 1846 shows that most of the north half of Section 23 and the fractional northeast corner of the southwest quarter of Section 23 were originally underwater and formed a part of a bed of a meandered lake, known as Long Lake. All of the disputed tract in Section 23 became land in place by the processes of accretion and reliction when the lake's waters completely receded many years prior to 1939. The particular area in controversy may be termed as the proportional division of the accretions riparian to the southwest quarter, extending northeasterly into the north half of Section 23.

In 1951, Gypsum by a single conveyance from one Lulu B. Zellner obtained numerous tracts of land in several different sections. This grant included a warranty deed to the "Frl. NW¼ of Section 23" and a quitclaim deed to the "NE¼ of Section 23."

Lulu B. Zellner, Gypsum's grantor, derived her chain of title to these lands by a will from her husband, A. C. Zellner, who died on July 29, 1944, and by conveyances thereafter from the remaining heirs of the original owner, B. O. Zellner, who had died intestate on June 1, 1922. Mrs. Zellner acquired the last of these conveyances vesting in her fee simple title to the lands of the B. O. Zellner Estate on August 29, 1945.

Greif Bros. by warranty deed dated August 16, 1940 acquired title to the "Fractional Southwest Quarter (SW¼) of Section Twenty-Three (23), * * * together will all accretions, relictions, and additions, thereto belonging" from its grantor, Arkamiss Timber Co.[1]

---

1. This conveyance was made after an interlocutory decree had been entered in

June of 1940 in a condemnation proceeding for a proposed cutoff to the Missis-

In the trial of the instant case to the court below, the District Judge admitted into evidence certain records, a map, and correspondence from the files of deceased Desha County Surveyor, Ike Bankston. These exhibits indicated that Mrs. Zellner in December of 1947 had employed Bankston to perform a joint survey with a surveyor of Greif Bros. to establish the boundaries of her lands, some years subsequent to a 1940 conveyance by herself and her husband on behalf of the heirs of B. O. Zellner to Greif Bros.

Following an appraisal of the findings of this survey, Mrs. Zellner informed Bankston by letter that although she knew the 1940 deed did not convey to Greif Bros. any part of Section 23, "I know they own the SW¼ of Section 23." However, she was unwilling to accept those boundaries in Bankston's map which illustrated the accretions to the SW¼ of Section 23 extending into the N½ as belonging to Greif Bros. Bankston's written reply insisted that Greif Bros. obtained ownership of a proportionate share of the accretions from Long Lake riparian to its SW¼ of Section 23 under Arkansas law.

Greif Bros.' argument is that having acquired ownership of the disputed accretions as the riparian landowner, it maintained entitlement thereto by the timely payment of taxes on the riparian land assessed as the "Frl. SW¼ & Accr., Sec. 23" since 1942. It contends these payments prevented any divestment of title by Gypsum for payment of taxes on the same land by itself and its predecessors in title for fifteen years pursuant to a different assessment and description under Ark.Stats.Ann. §§ 37–102, 37–103. Greif Bros. also maintained that the Bankston exhibits would estop Mrs. Zellner, and likewise her successor in

title, Gypsum, from claiming any of the accretions shown to be riparian to lands concededly not owned.

While, on the other hand, Gypsum urged in support of its claim of title that it had paid taxes on this unsurveyed tract of land formed by accretion and reliction according to the only valid tax description, "NW¼ Section 23 and NE¼ Section 23," which is based on an extension of the existing lines of the Government Survey of 1846.

The District Court found as fact that:

(1) All of the area in Section 23 was shown as the bed of a meandered lake and platted as such on the General Land Office Plat of Survey on December 23, 1846;

(2) By recession of the water in the lake, the area in controversy arose from the bed of the lake and by such processes of accretion and reliction and the gradual recession of the water became land in place many years prior to 1939;

(3) All of said controversial area was from the time it arose from the lake bed and continued to be wild, unimproved, unenclosed and unoccupied timber land;

(4) At least since 1936 the area in controversy had been separately assessed for taxation by county officials under descriptions Frl. Northwest Quarter (NW¼) Section Twenty-Three (23) and Northeast Quarter (NE¼) Section Twenty-Three (23);

(5) The area in controversy would be properly described if the lines of the public survey be extended as lying within the Northwest Quarter of Section 23 and the Northeast Quarter of Section 23; and

(6) Gypsum and its predecessor in title paid taxes on this description in unbroken sequence for the years 1945 to 1959, inclusive.

sippi River instituted by the United States Government in the United States District Court for the Eastern District of Arkansas. The suit involved land belonging to the heirs of B. O. Zellner, represented by their agent and attorney in fact, A. C. Zellner, and Arkamiss Timber Company, among others. A final decree was entered in February 1941,

finding that a tract of land described as "Tract A-1" was vested in Arkamiss. This tract was portrayed in an exhibit commonly referred to as the Nelson Map which showed it extending northeasterly from the southwest quarter of Section 23 into what would have been the north half of this section had it been surveyed and sectionalized.

The District Court concluded that Gypsum was invested with title by operation of the aforecited Arkansas statutes which make payment of taxes under color of title equivalent to adverse possession.[2]

Our duty as a federal appellate tribunal when asked to review a matter of local state law in a diversity case is limited to determining whether or not the District Court in its findings made permissible interpretations of the applicable state law. James Talcott, Inc. v. Associates Discount Corp., 302 F.2d 443, 449 (8th Cir. 1962); Anderson-Tully Co. v. Chicago Mill & Lumber Co., 175 F.2d 735, 736 (8th Cir. 1949); Anderson-Tully Co. v. Murphree, 153 F.2d 874, 877 (8th Cir. 1946).

We have previously recognized that under Arkansas law for a claimant to prevail in an action to quiet title, he must prove and rely wholly upon the superior strength of his chain of title and cannot depend his recovery upon a showing of a defect or weakness in the title of an adversary. Bryant v. Chicago Mill & Lumber Co., 216 F.2d 727 (8th Cir. 1954); Anderson-Tully Co. v. Murphree, supra. The valid acquisition by Greif Bros. of title to land described as "SW¼ of Section 23, together with all accretions and relictions" would without question convey ownership to both existent as well as subsequently formed alluvion riparian to the original grant. Wyatt v. Wycough, 232 Ark. 760, 341 S.W.2d 18 (1961); Crow v. Johnston, 209 Ark. 1053, 194 S.W.2d 193 (1946); State v. Harper, 161 Ark. 666, 256 S.W. 78 (1923). As an adjunctive right of riparian ownership, ordinarily the payment of taxes by Greif Bros. pursuant to the assessment and description of the original tract of land designated on the tax records as "Frl. SW¼ & Accr. Sec. 23" would constitute payment on the disputed accretions provided the riparian rights had not been severed by separate conveyances or assessment. Bryant v. Chicago Mill & Lumber Co., 120 F.Supp. 463, 467 (E.D.Ark.1954), aff'd 216 F.2d 727 (8th Cir. 1954).

Gypsum proved to the satisfaction of the District Court that the disputed accretions in the North Half of Section 23 were severed from the riparian Southwest Quarter by a valid, separate tax assessment. The District Court was also satisfied that the taxes were paid pursuant to this assessment for the period required to avail Gypsum of the benefits of the adverse possession statutes.

Ark.Stat.Ann. § 37–102 provides that payment of taxes on wild, unim-

2. "I.
"When the lands in controversy arose from the bed of the meandered lake and became land in place, they became the property of private owners of abutting lands and were subject to taxation although unsurveyed and could be described for taxation in any appropriate manner sufficient to give public notice as to what lands were being taxed.
"II.
"That the description Northwest Quarter (NW¼) Section Twenty-Three (23) and Northeast Quarter (NE¼) Section Twenty-Three (23) according to the extended lines of the government survey are valid and sufficient descriptions to give public notice as to what lands were thereby being assessed for taxation.
"III.
"That the payment of taxes under said descriptions upon wild, unimproved, unenclosed and unoccupied land by plaintiff in unbroken sequence for years 1951 to 1959, inclusive, has vested title to the North Half (N½) of Section Twenty-Three (23) * * * in the plaintiff, U.S. Gypsum Company, under Section 37–102 * * * and when coupled with the payment of taxes on said description by its predecessor, Lula (sic) Zellner, in unbroken sequence for years 1945 through 1950, inclusive, has vested title to the North Half (N½) of Section Twenty-Three (23) in plaintiff under Sections 37–103, Arkansas Statutes Annotated. * * *
"IV.
"That the defendant, Greif Bros. Cooperage Corporation, has by virtue of the tax payments mentioned in III above been divested of any title which it may have otherwise acquired to any land lying within what is described if the lines of the public surveys be extended as the North Half (N½) of Section Twenty-Three (23). * * * *"

proved and unenclosed land for seven consecutive years under color of title shall be considered as actual possession for such period. Ark.Stat.Ann. § 37–103 states that payment of taxes on such lands for a period of fifteen consecutive years shall create a presumption of law that the taxpayer or his predecessor in title held color of title prior to the first payment. We are aware that when the terms of these statutes have been met, they operate affirmatively to vest title in the taxpayer. Bryant v. Chicago Mill & Lumber Co., supra, 216 F.2d at 734.

However, Greif Bros. also paid taxes on the riparian land pursuant to the tax description "SW¼ & Accr. Sec. 23" preceding and during the same fifteen years of payment by Gypsum and its predecessor in title. Thus, the critical determination is whether the tax payments of Gypsum and its predecessor in title under the descriptions "Frl. NW¼ of Section 23" and "NE¼ of Section 23" based on an extension of the public survey lines constituted the only legally sufficient tax description of these newly formed accretions during the period in question.

In Buckner v. Sugg, 79 Ark. 442, 96 S.W. 184 (1906), the Arkansas Supreme Court upheld a sale for delinquent levee taxes of the riparian owner's unsurveyed accretions which arose out of a lakebed on the ground that a tax description based on an extension of the surrounding public survey lines sufficiently identified the land sold so as to apprise the riparian owner and the public with notice that the land was charged with a tax lien.

The Buckner rationale was reaffirmed in Maney v. Dennison, 110 Ark. 571, 163 S.W. 783 (1914), upholding the validity of another tax sale in which the unplatted accretions were described by reference to the latest government survey's extended section lines.

■ Thus, unsurveyed land which has arisen from underwater to form accretions to surveyed riparian land becomes private property subject to taxation by separate assessment and description in accordance with extension of the lines of public survey.

However, a distinction has been drawn where the accretions represented remade or reformed land originally surveyed before being washed away and redeposited.

In Chicago Mill & Lumber Co. v. Tully, 130 F.2d 268, 275 (8th Cir. 1942), we protected a landowner's right to accretions for the payment of taxes on the riparian land where the accretions originated as surveyed land in place which caved into the Mississippi River, washed away, and was redeposited in the same area against one claiming ownership under tax titles describing the accretions as if they had been sectionalized according to the ancient survey. In reaffirming this decision in the similar case of Anderson-Tully Co. v. Chicago Mill & Lumber Co., supra, we explained that such a description of reformed accretions for tax purposes based on the ancient survey was ineffectual. While extension of the old survey would mark a geographical location, it would not serve to connect the new situs of the land with ownership which must be the purpose of a land survey.

■ We clearly distinguished the problem of describing unsurveyed newly formed accretions as in the Buckner and Maney cases from the situation of reformed accretions originally surveyed as posed in the two Chicago Mill-Anderson-Tully cases. We said that in the former cases of new unsurveyed land emerging from beneath the water subject to private ownership and taxation for the first time, a severance of such accretions could be effected by separate tax assessment validly predicated on an adequate description for public notice according to a popular designation given it by extending the existing lines of the public survey. Contrarily, in the latter instances, surveyed land lost to its original owner by being washed away and being redeposited as new land on the same geographical situs by accretion to riparian lands, cannot be legally described for taxes to work a severance by reference to old nonexistent

descriptions which are based on the prevailing but for this purpose now "obsolete" survey.

Since the disputed accretions in the instant case emerged as new land in place, never before surveyed, its tax description as NE¼ and NW¼ of Section 23 by extension of the public survey lines gave the riparian owner adequate legal notification of the separate assessment and taxation of the accretions. Therefore, the District Court permissibly concluded that the payment of taxes incident to a valid description for the statutory period by Gypsum and its predecessors in title properly vested them with title under Ark.Stats.Ann. § 37–102 and § 37–103.

While Greif Bros. concedes that it paid taxes on the same lands inadequately described in its assessment as "SW¼ & Accr. of Section 23," it asserts the description sufficed to invoke the aforementioned statutes for its benefit. But in Sanders v. Plant, 211 Ark. 913, 204 S.W.2d 323 (1947), a statutory tax sale of lands similarly described as "accretions, Section 20" was held void because of an indefinite description. There, the accretions which had formed to two separate quarter sections of Section 20 had been later surveyed and carried on the tax rolls separately, but the sale description ignored the exact survey designations. And the Arkansas Supreme Court has also held that the adverse possession statutes do not apply where the description of the land on which taxes are paid is indefinite. See Charles v. Pierce, 238 Ark. 22, 378 S.W. 2d 213 (1964); Darr v. Lambert, 228 Ark. 16, 305 S.W.2d 333 (1957).

Greif Bros.' tax description of the disputed accretions did not serve to fix their geographical location. The tax description under which Gypsum claims title precisely locates the land in question as lying partially in the NW¼ and NE¼ of Section 23 according to a proper extension of the survey lines. The fact that Greif Bros. was consistently first to pay its taxes during most of the years in question does not strengthen its claim of title since the payments were being made under a void description.

We further find that as to the controverted area in the North Half of Section 23, Gypsum is not estopped to claim title thereto by virtue of its predecessor's concession that she knew Greif Bros. owned the Southwest Quarter of Section 23 or by knowledge from her agent, the Desha County Surveyor, that under the law of accretions and relictions the riparian landowner of the Southwest Quarter, Greif Bros., was entitled to these lands as accretions. The District Court upon substantial evidence found that Bankston, the County Surveyor, had been employed by Mrs. Zellner as her agent to make the 1947 survey and map. Assuming the applicability of the general rule that a principal is charged with knowledge of facts learned by his agent while in the discharge of his duties, MFA Mutual Ins. Co. v. Jackson, 271 F. 2d 180 (8th Cir. 1959), neither a case for equitable estoppel nor estoppel by deed against Gypsum and its grantor based on this information standing alone has been made.

It is the law of Arkansas that "An estoppel in pais [equitable estoppel] is conduct intended and calculated to induce, and in fact inducing, another person to alter his condition so that it would be a fraud on him to allow the other person to take an inconsistent attitude to his detriment." Thompson v. Wilhite, 131 Ark. 77, 198 S.W. 271, 272 (1917). See also Hudson v. Union and Mercantile Trust Co., 155 Ark. 605, 245 S.W. 9 (1922); James Talcott, Inc. v. Associates Discount Corp., supra 302 F.2d at 446.

Clearly, the facts here do not fit this form of estoppel, as there has been no showing by Greif Bros. that it relied to its detriment on any representation by Gypsum or its grantor that ownership to the disputed accretions was conceded. Cf. Rinke v. Weedman, 232 Ark. 900, 341 S.W.2d 44, 46 (1960).

Likewise, if Greif Bros. is relying on the hybrid form of estoppel by deed, such a theory is inapposite as to

resolution of the conflicting claims between Greif Bros. and Gypsum to the accretions in Section 23. With respect to this land, each party deraigns its title from different sources. Obviously, without a showing by Greif Bros. that it executed a deed with Gypsum or its privies as to this land, there could be no case for claiming that the "grantor" should now be estopped from asserting a contrary right against the "grantee" in derogation of a non-existent deed. See, e. g., Bass v. Willey, 216 Ark. 553, 226 S.W.2d 980 (1950); 31 C.J.S. Estoppel § 13 (1964).

### SECTION 22 TRACT

In 1914 B. O. Zellner and B. F. Young obtained jointly two quitclaim deeds conveying to them the Frl. S½, Section 21 and Frl. E½, Section 22, among other lands, all in Township Eleven South, Range One West. After B. O. Zellner died in 1922, B. F. Young conveyed by warranty deed to A. C. Zellner, "as agent for the estate of B. O. Zellner," the Frl. E½, Section 22.

During 1931, A. C. Zellner, also an heir of B. O. Zellner, obtained powers of attorney from the remaining heirs. In one of these instruments four of the heirs empowered A. C. Zellner "To carry on the farming enterprise and all other enterprises * * * on all lands we may be interested in in Arkansas * * * sell timber from any or all real estate in the State of Arkansas in which we may be interested, and to lease, sell and convey all title that we may have in any real estate in said State. * * *" Another heir, Mrs. Charles E. Moore, also executed a similar, but separate, power of attorney, appointing A. C. Zellner to act in her behalf. The remaining heir, Mrs. G. O. Walker, likewise executed such a power of attorney, varying only in its terms in failing to specifically authorize A. C. Zellner with power to convey real estate in which she had an interest.

Subsequently, in August of 1940, A. C. Zellner acting "individually and * * * as attorney in fact" for the above surviving heirs of B. O. Zellner, conveyed with his wife Lulu B. Zellner by quitclaim deed to Greif Bros. the following described properties in Desha County:

"All that part of Sections 21 and 22, Township Eleven South (T 11 S), Range One West (R 1 W), lying and being situated South of the Northernmost Chute or depression through said sections and North of the main channel of the Mississippi River as same is now located.

"It being the intention of the parties hereto to convey title to all land which has formed on that portion of said sections which between the time of the survey of 1846 caved into the Mississippi River and subsequently reformed, together with any accretions or additions thereto either by way of accretion, reliction, or reformation of submerged lands and shall in no wise whatever convey any interest in any portion of said sections which, has not, subsequent to the original township survey, caved into the Mississippi River."

After the death of A. C. Zellner in 1944, which automatically revoked the surviving heirs' powers of attorney held by him, Lulu B. Zellner acquired by testament her husband's remaining interests in the lands of the B. O. Zellner Estate as well as all interests of the other heirs by conveyance, the last of which was executed on August 29, 1945. On September 1, 1951, she conveyed to Gypsum by the aforementioned instrument a warranty deed to the E½ and Frl. W½ of NW¼, Section 22, and a quitclaim deed to the E½ of NW¼, Section 22, which included all accretions or relictions owned by her or in which she had an interest.

The District Court found that the Bankston survey and map resolved the boundary in Section 22 in dismissing Gypsum's action for the wrongful removal of timber by Greif Bros. from the disputed lands in that section and concluded:

"I.

"That defendant's deed, being of record and in plaintiff's chain of

title, constitutes notice to the plaintiff that the accretion or re-formed lands South of the northernmost chute had been severed from the riparian lands in place in Section 22.

"II.

"That Lula (sic) B. Zellner, plaintiff's grantor, would be estopped to maintain this action or to question the valdity of defendant's deed or the joint survey, and that the plaintiff, being a privy in estate with Mrs. Zellner, is also estopped to maintain this action.

"III.

"That the defendant's tax payments over a period of the past 20 years invest it with an indefeasible fee simple title to said lands."

We have reviewed Greif Bros.' chain of title to the disputed property in Section 22 and have concluded that the District Court did not misinterpret Arkansas law in finding it valid.

■ The all important deed of 1940 from A. C. Zellner and Lulu B. Zellner to Greif Bros. was a valid conveyance to the lands described therein. Under the plain language of the deed A. C. Zellner individually conveyed his interest in the property as an heir of B. O. Zellner as well as those interests of all remaining heirs of the estate in his representative capacity as their agent and attorney in fact. The best evidence that the powers of attorney executed in his behalf by these heirs in 1931 had not expired at the time of the conveyance in 1940 is the fact that as late as 1941 when judgment in the condemnation proceeding was rendered, he was named in the decree as the agent and attorney in fact for all the heirs of B. O. Zellner to receive for them their share of the compensation awarded for that portion of the estate's lands condemned in Section 22. Moreover, the heirs' apparent acquiescence and acceptance of the benefits from the 1940 conveyance constituted ratification of A. C. Zellner's authority to sell the property as their agent. See Thompson v. Kinard, 168 Ark. 1057, 272 S.W. 668 (1925); Swift v. Erwin, 104 Ark. 459, 148 S.W. 267 (1912); Carter v. Gray, 79 Ark. 273, 96 S.W. 377 (1906). These same heirs did not resume individual exercise of their rights in the property of the estate until their powers of attorney were automatically revoked in 1944 upon A. C. Zellner's death. They commenced in that same year to convey their interests to his surviving wife, Lulu B. Zellner.

■ Neither do we believe that the 1940 deed failed to convey to Greif Bros. that interest in the lands of the estate acquired in a warranty deed by A. C. Zellner, as agent for the estate, in 1924, from B. F. Young. The granting clause in the 1940 deed leaves no doubt that A. C. Zellner conveyed not only all his individual ownership in the described lands, but also transferred all interest owned therein by the named heirs of the B. O. Zellner Estate, as their attorney in fact. This intent of the grantor is borne out by his signing the deed both as "A. C. Zellner" and "A. C. Zellner, Trustee." Consequently, Greif Bros.' title is unaffected by Ark.Stat.Ann. § 50–412 which pertains to conveyances by a grantor in a representative capacity who does not fully disclose the owners of the interest he represents.[3]

3. Section 50–412 provides:
"*Conveyance to trustee or agent.*— The appearance of the words 'trustee', or 'as trustee' or 'agent' following the names of the grantee in any deed of conveyance of land heretofore or hereafter executed, without other language showing a trust, shall not be deemed to give notice to or put on inquiry any person dealing with said land that a trust or agency exists, or that there are other beneficiaries of said conveyance except the grantee named therein, and such conveyance shall vest the title to such land in such grantee and a conveyance of land by such grantee, whether followed by the words 'trustee' or 'as trustee' or 'agent' or not, shall vest title in his grantee free from any claims of all persons or corporations. This act [section] shall not apply to any suits now pending. [Acts 1919, No. 444, § 1, p. 327; C. & M. Dig., § 1504; Pope's Dig., § 1813.]

Gypsum first defends the validity of its title from Lulu B. Zellner in 1951 against constructive notice of a defect by reason of the prior deed to Greif Bros. in 1940 on grounds that the powers of attorney incident thereto were not contemporaneously filed with the 1940 deed as required by Ark.Stat.Ann. § 50–422. The findings of the District Court do not directly pass upon this contention. Neither do the pleadings nor the record of evidence manifest reliance below on the alleged defense. Under these circumstances, Gypsum has waived any right to consideration of this defense raised for the first time on appeal. Fed. R.Civ.P. 12(h); Nakdimen v. Baker, 111 F.2d 778, 782 (8th Cir. 1940); E. I. Du Pont De Nemours & Co. v. Martin, 174 F.2d 602 (6th Cir. 1949).

Secondly, Gypsum contends that it should not be charged with constructive notice of the 1940 deed as a defect in its chain of title because (1) the imperfect description in the earlier deed from the shared grantor, Lulu B. Zellner, did not even purport to convey to Greif Bros. the controverted area in Section 22 and (2) it was without knowledge of the subsequent, unrecorded survey in 1947.

The boundary in the 1940 deed to Greif Bros. complained of as vague by Gypsum is the northern limit to the lands conveyed in Section 22 which is defined as the northernmost chute or depression through that section. In that deed, the parties further elaborated upon their metes and bounds description by expressing their intention to convey all the lands that had caved into the Mississippi River and reformed as accretions subsequent to the 1846 survey. After careful examination of the entire transcript of evidence including the many exhibits, we are not convinced that the District Court was mistaken in its conclusion that this descriptive language effectively conveyed the controverted land in Section 22 to Greif Bros.

However, the larger question is whether Gypsum was a good faith purchaser without notice, actual or constructive, of this prior recorded deed when it bought in 1951 from one of the same grantors of Greif Bros., Lulu B. Zellner, much of this same property described in its deed as the E½, Frl. W½ NW¼ and E½ NW¼ of Section 22.

The rule is well settled in Arkansas that a purchaser of lands takes them with constructive notice of whatever appears in his chain of title. If sufficient appears therein to put a prudent man on inquiry, which would, if prosecuted with ordinary diligence, lead to actual notice of a right or title in conflict with what he is about to purchase, and he fails to make such inquiry, the law will charge him with the actual notice he would have received, if he had made it. Vaughn v. Dossett, 219 Ark. 505, 243 S.W.2d 565 (1951); Gaines v. Saunders, 50 Ark. 322, 7 S.W. 301 (1888). See also Abbott v. Parker, 103 Ark. 425, 147 S.W. 70 (1912); White v. Moffett, 108 Ark. 490, 158 S.W. 505 (1913).

Appearing in Gypsum's chain of title was the 1940 deed to Greif Bros. It was sufficient in its terms to apprise Gypsum as a reasonable grantee that Greif Bros. might well hold a superior prerecorded title to the disputed lands in Section 22 by reason of its earlier deed from their common grantor. It was, therefore, incumbent upon Gypsum to have exercised due diligence by inquiring of Lulu B. Zellner as to the extent of her rights to property in Section 22 following the 1940 deed. Such an inquiry would have certainly brought to light the survey of 1947, prepared by the County Surveyor upon commission by Lulu B. Zellner and in her possession for some five years prior to the conveyance to Gypsum. This survey clearly depicts the northernmost chute or depression marking the dividing boundary in Section 22 between the Zellner and Greif Bros.' properties following their 1940 deed. This survey indicates that the 1914 shoreline of the Mississippi River coincided with this chute which was the parties' chosen boundary. Such evidence confirms the fact that this particular chute marks the northernmost recession of the river's shoreline since the 1846 survey and that

the land subsequently formed by accretion to the south was the very alluvion intended to be conveyed by the added language of the 1940 deed. Thus, the District Court's holding to this effect had support in the record.

Having been remiss in its title investigation, Gypsum is charged with knowledge of this information which a diligent inquiry would have uncovered, thereby preventing it from attaining the status of a bona fide purchaser.

Moreover, the District Court also correctly held that as to the controverted lands in Section 22, Greif Bros.' grantor, Lulu B. Zellner, and Gypsum, her privy in estate, are estopped from asserting any alleged invalidity of the joint survey or the 1940 conveyance to Greif Bros. See Vaughn v. Dossett, supra.

And, finally, the District Court's finding that Greif Bros. paid taxes on this land pursuant to a valid description for a period exceeding the statutory requirement to vest it with an indefeasible fee simple title is amply supported by the evidence.

For the reasons hereinbefore stated, the judgment is in all things affirmed.